Lawrence J. HOLT et al.,
Petitioners,

v.

Terrell Don HUTTO, Commissioner of Correction, State of Arkansas, et al., Respondents.

No. PB–69–C–24 and 33 related cases.

United States District Court,
E. D. Arkansas,
Pine Bluff Division.

Aug. 13, 1973.

Jack Holt, Jr., Philip E. Kaplan, Little Rock, Ark., for petitioners.

Milton Lueken, Asst. Atty. Gen., of Ark., Ted Boswell, Little Rock, Ark., for respondents.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

These 34 individual and class actions have been brought by Arkansas convicts against the members of the Arkansas State Board of Correction, Terrell Don Hutto, the Arkansas Commissioner of Correction who administers the prisons within the jurisdiction of the Arkansas Department of Correction, and certain lesser prison officials. Petitioners are inmates of the Cummins Unit of the Department which is located in Lincoln County, Arkansas, and of the Tucker Intermediate Reformatory located in Jefferson County.

While different individual inmates naturally complain about different things, petitioners as a class contend that in spite of previous decrees and opinions of this Court conditions in and practices at both of the institutions that have been mentioned are such as to render the confinement of human beings there a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the Constitution of the United States. They also complain of racial discrimination and make a number of other complaints which will be mentioned in due course. Respondents deny that the complaints have merit.[1]

In 1969 this Court granted a measure of injunctive relief to the inmates of Cummins. Holt v. Sarver, Commissioner of Correction, E.D.Ark.1969, 300 F. Supp. 825 (Holt I). The litigation continued into 1970 and was extended to include the Tucker Unit and to bring in numerous inmate petitioners. After extensive hearings, the Court found that conditions and practices at both institutions were such as to render the confinement of a human being in either one of them a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments to the Constitution of the United States. Holt v. Sarver, E.D.Ark.1970, 309 F.Supp. 362 (Holt II).

The Court entered a decree declaring the unconstitutionality of the prisons and specifically enjoined the continuation of what was left of racial segregation at both institutions. Jurisdiction of the case was retained, and respondents were directed to file a report setting out what they proposed to do to

---

1. While some of these cases name lower echelon prison personnel as respondents, the term "respondents" as herein used refers to the members of the Board of Correction, the Commissioner of Correction, and the respective Superintendents of the Tucker Intermediate Reformatory (Tucker) and the Cummins Unit (Cummins). Those individuals are, of course, responsible within limits for the conduct of their subordinates, and the subordinates are bound by orders of this Court affecting their superiors.

bring the Department up to constitutional standards.

Respondents appealed, and the Court's decision was affirmed. Holt v. Sarver, 8 Cir., 1971, 442 F.2d 304. This Court was directed to retain jurisdiction of the prisons at least for a time.

Progress reports were filed by respondents from time to time in 1970 and 1971. On December 30, 1971, the Court, after hearings, filed a Supplemental Decree which amplified and made more specific in certain respects its earlier decree. Jurisdiction was again retained.

The Court continued to receive numerous inmate complaints in 1972, and on September 8 of that year the Court filed a Memorandum Opinion and entered an order permitting a number of such complaints to be filed under the provisions of 42 U.S.C.A., section 1983, read in connection with 28 U.S.C.A., section 1343(3). The later cases were consolidated with the earlier ones, and hearings were held in November and December, 1972, and in January 1973. The inmates as a class have been represented ably by Messrs. Jack Holt, Jr. and Philip E. Kaplan of the Little Rock Bar, both serving by Court appointment since 1970. Respondents have been represented by members of the staff of the Attorney General of Arkansas and by Mr. Ted Boswell of Little Rock and Bryant, Arkansas, who was employed by some of the respondents as special counsel.

This litigation today stands in a posture quite different from that in which it stood in 1969 and 1970. In those years the Court was dealing with officially prescribed or sanctioned conditions and practices which were claimed to be unconstitutional, and the controlling facts were essentially undisputed. Today, most of the practices and conditions alleged by petitioners to exist and of which they complain are not officially approved or sanctioned, and a number of them are specifically prohibited by rules and regulations of the Department which appear in the Department's Inmate Handbook and Employee Handbook, copies of which are in the record. Additionally, controlling facts are sharply disputed in many areas.

Inmate complaints extend over practically the entire spectrum of prison life, and in trying to resolve the disputed factual issues the Court has encountered in full measure the credibility problems inherent in litigation of this kind. In resolving the issues of fact before it, the Court has done the best that it could, employing in that connection its own common sense and its experience with the Department which extends over a period of at least eight years,[2] and which has involved the reading of literally hundreds of inmate complaints or "writs."

From its consideration of the evidence as a whole, the Court finds ultimately that none of the individual petitioners, as individuals, have shown that they are entitled to specific equitable relief. But, the Court further finds that notwithstanding significant progress and improvements that have been made at both Cummins and Tucker, some problem areas of constitutional significance continue to exist, and that the inmates as a class stand in need of some additional injunctive relief, and that respondents need to be admonished about a number of things.

I.

To accentuate the positive, the Court will say first that as a result of changing attitudes and efforts on the part of the Arkansas Legislature, the present Governor of Arkansas and his predecessor, the Board of Correction, incumbent Commissioner of Correction, Terrell Don Hutto, and his predecessor, C. Robert Sarver, and some of Mr. Hutto's subordinates, the Arkansas prison system is simply not the same system that existed in 1969 and 1970 and in prior years.

2. It was in 1965 that the Court decided Talley v. Stephens, Superintendent of the Arkansas State Penitentiary, E.D.Ark., 1965, 247 F.Supp. 683.

To start with the iniquitous "trusty system" described in detail in Holt I and Holt II, supra, has essentially been dismantled. Free world personnel have replaced the trusties in positions of authority throughout both prisons. While there are still a few trusty guards, they do not represent the threat to ordinary inmates that they have done in years past, and the Court is confident that the few that remain will soon be phased out.

Writing in prior years, the Court was gravely concerned with the risk that inmates confined in barracks ran of homosexual or deadly assaults by other inmates. While the barracks are still seriously overcrowded, and while additional housing facilities are still needed, particularly at Cummins, and while inmate assaults on other inmates and fights between inmates still occur, as they do in all prisons, the problem is not what it was in former days.

Since Holt II was written, the Department has constructed a maximum security unit at Cummins in which are housed the most dangerous and unstable inmates, and they are thus removed from the general and more tractable prison population. It appears to the Court that somewhat less than 10 percent of the total population of Cummins is confined in the maximum security unit, and a very large portion of the complaints that the Court receives come from the inmates of the unit, a fact which is not without significance.

As its name implies, Tucker is a reformatory type institution, and it has an advancing program of education and training for its comparatively young and unhardened inmates. Tucker is a much smaller institution than Cummins; its population is generally a little over 300 as compared to an average population at Cummins of some 1100 or 1200 inmates. Prior to the 1972–73 hearings the Court received substantial numbers of complaints from the inmates of Tucker; however, during the last few months section 1983 complaints from Tucker inmates have become almost nonexistent.

There is a limited program of vocational and educational training available at Cummins, but inmate participation therein is not as encouraging as that at Tucker. That, however, is explainable by reference to a number of factors, including ages, dispositions, and criminal records of many of the inmates of Cummins.

The Department has recently acquired law libraries for the use of inmates at both institutions, and the Court finds that those libraries are adequate for legitimate inmate purposes, and that rules for the use of the libraries are not unreasonable. The Department has also employed a lawyer who serves full time as Legal Adviser for the inmates at both institutions, and he is of substantial assistance to them in connection with many of their legal problems, although he is not in a position to assist them when they come into conflict or controversy with prison personnel.

A third institution administered by the Department but not directly involved in this particular phase of the overall prison litigation is the Women's State Reformatory presently located on the same tract of State owned lands as is the Cummins Unit where male prisoners are confined. The Women's Reformatory houses a small number of female inmates. It has given some constitutional trouble in the past. However, the Court has had no complaints about it for months. It is capably administered by a Negro matron or Superintendent, and it appears to be a constitutionally tolerable institution. It is to be moved from its present location to a new site near the City of Pine Bluff, and initial phases of construction of the new facility are now under way.

In pointing out significant improvements that have been made at both institutions the Court does not overlook the fact that serious deficiencies, whether constitutional or not, exist at both Cummins and Tucker. Contributing factors to those deficiencies, some of which will be mentioned, are lack of funds and the

rural locations of both institutions a substantial distance by road away from each other.

While many inmates have complained that they have been intentionally denied medical and dental services which it was within the power of the Department to provide, the Court does not so find. And it appears to the Court that many of the inmate complaints have stemmed from the fact that they were not treated as quickly or cured as rapidly as they desired or were not given the quantity or quality of medication that they wanted. A great many people in the free world would have the same complaints.

The Court finds that the Department has done the best that it could in the area of medical services with the resources at its command. That is not to say, however, that deficiencies have not existed and do not continue to exist. As of the date upon which the hearings were closed, the Department had never had a full time physician whose services were available to inmates. Inmates were treated by paramedical personnel who generally had to work without the direct supervision of a doctor. Inmates in need of hospitalization were, and still are, carried to Little Rock or Pine Bluff for treatment. Dental services apparently are largely limited to extractions and the supplying of false teeth.

Since the hearings closed, the Department has been able to employ a full time physician, and his services should be quite helpful. However, his services alone will not by any means solve all of the medical problems of the Department.

One serious problem is that a number of inmates are mentally ill or emotionally disturbed and probably should not be in a penal institution at all. Unfortunately, a viable alternative to their confinement in the Department does not exist in Arkansas today since the Arkansas State Hospital for Nervous Diseases in Little Rock will not care for them except when they are violent. Some of these people are extremely dangerous to themselves and to their keepers and other inmates and tend to keep other inmates in states of unrest and excitement.

Apart from mentally ill inmates, there are also some inmates who have serious and chronic physical ailments which render confinement in an ordinary penal institution undesirable, but, again, there is no viable alternative existing today. The problem is complicated by the fact that the Arkansas State Sanatorium at Booneville, an institution for the treatment of tuberculosis, has now been closed. It goes without saying that prison inmates who are active tuberculars or who have other infectious or contagious diseases must be segregated from other inmates, and the Court assumes that respondents can and will work out methods whereby such segregation can be effected.

Kitchen and sanitary facilities at Tucker stand in serious need of improvement, and improvements are contemplated. Improvements are also needed at Cummins. The overcrowding of the barracks should be eliminated or mitigated, and there is a strong need for a minimum security unit at Cummins.

In the course of the hearings the Court heard some testimony involving complaints about clothing issues, and after the hearings were closed a number of inmates of Barracks No. 7 at Cummins submitted a complaint about alleged insufficiencies of issues of underwear and about inadequate laundry facilities. The Court denied that petition summarily but stated that it would take up the matter of clothing in this opinion.

The Court does not find that clothing issues and issues of footwear are seriously deficient. Of course, shortages of particular items occur from time to time, and laundry service may be deficient from time to time. It might also be observed that at times inmates are careless with their clothing, and at times steal items of clothing from other inmates.

The deficiencies that have been mentioned and others like them call for

correction, but they are not such, in the Court's opinion, as to render confinement today at either Cummins or Tucker unconstitutional. The main problem at both institutions from a constitutional standpoint lies in prison administration. The quality of the Department's personnel at both institutions is seriously deficient, and the Court is convinced that that deficiency lies at the root of most of the serious problems in the Department.

Commissioner Hutto, A. L. Lockhart, Superintendent at Cummins, R. G. Britton, Superintendent at Tucker, and some of their subordinates came to the Department from the Texas Penal System. Cecil Boren, Associate Superintendent at Cummins, did not come from Texas and, indeed, was an employee of the Department when C. Robert Sarver was Commissioner. Those four men, plus a very few others, make up the top echelon of the administration of the prisons; they are, so to speak, the "management" of the institutions. Lower ranking employees grade down through tables of organization to the lowest grade of ordinary guard.

With some reservations as to particular individuals, the Court finds that Messrs. Hutto, Lockhart, Britton, and Boren are qualified for their jobs, and the Court thinks that up to a point at least they are trying to do good jobs and to run an efficient, reasonably humane, and constitutional prison system.

The Court cannot say as much for lower echelon personnel as a class. Those employees have in general been recruited locally; they are poorly paid by modern standards; they have had little training or experience; many of them are uncultured and poorly educated; some of them are quite young, perhaps too young to be in position of authority over convicts; some of them are quick tempered. If one adjective is to be used to describe them, it would be "unprofessional."

From top to bottom the personnel of the Department are predominantly white notwithstanding the fact that the inmate population of both institutions is approximately 50 percent black. There are very few black employees, and with one or two exceptions there are no blacks in positions of any real authority at either institution. Important as the Classification Committees and Disciplinary Committees at both institutions are, there has been, except for perhaps a few isolated instances, no black representation on those Committees.

A prison staff and the population of the prison naturally react on each other. Ignoring distinctions between Cummins and Tucker, inmates of the Department are not only racially mixed; they also differ greatly in ages, cultural levels, dispositions, criminal records, intelligence, education, training, and experience. Most of them, indeed the great majority of them, had extremely poor work records in the outside world. And, they have carried into the prisons with them the same weaknesses and deficiencies that they had in the outside world and that got them into prison in the first place.

With particular regard to the black inmates as a group, it is probably safe to say that they are drawn from the lower strata of the black population. As a class, they are neither well educated nor industrious; and they appear to be highly suspicious of those in authority over them. Some have difficulty in communicating intelligently, particularly under conditions of stress.

The personnel that have been described and the inmate population that has been described are in day to day contact within the abrasive atmosphere of penal institutions. Given the quality of the personnel and the quality of the inmates, the contacts between them will inevitably produce friction, stress, unrest, and at times violence.

With certain exceptions to be mentioned the Court finds that if the prescribed rules and regulations of the Department were in fact administered conscientiously and with reasonable effi-.

ciency and with appropriate supervision by higher echelon prison employees, it would not have any real constitutional problem with either Cummins or Tucker. Unfortunately, the Court is not able to find that the declared policies and prescribed rules and regulations of the Department are in fact being carried out conscientiously and effectively, and, on the contrary, the Court is persuaded that the Department's policies, rules, and regulations are not being carried out properly in some significant areas.

In other words, and subject to certain exceptions, the Court is convinced that today it is dealing not so much with an unconstitutional prison system as with a poorly administered one. However, unconstitutionality can arise from poor administration of valid policies as well as from policies that are constitutionally invalid themselves.

The Court will make no effort here to discuss every problem that has arisen or conceivably may arise in the Department in the future. Rather, the Court will confine itself to certain specific serious problem areas. While institutional problems of constitutional significance fall into well defined categories, it is necessary to keep in mind that the categories are not mutually exclusive; they tend to overlap, particularly where race is involved.

## II.

In this section of the opinion the Court will take up claims of racial discrimination against black inmates,[3] and the claim of Black Muslim inmates that they are subjected to additional discrimination and oppression on account of their religion. The Court will take up, first, the peculiar problems of the Black Muslims.

■ (a) It is now thoroughly established by judicial opinions too numerous to mention that the Black Muslims confined in prisons in this country constitute a religious sect and are entitled, within reasonable limitations dictated by the conditions of prison life, to the protection of the First Amendment as carried over into the Fourteenth and by the Fourteenth Amendment itself. That means that Black Muslims may not be discriminated against on account of their religion, that they are not to be unreasonably restricted in the exercise or practice thereof, and that at least some accommodations must be made by prison authorities to some requirements and taboos of their professed religious belief.

There are a few Muslims in both Cummins and Tucker. Without any particular elaboration the Court finds that the Muslims at both institutions have some problems that are not without constitutional significance. Their problems are mainly dietary in that Muslims are forbidden by their religion to consume pork in any form. While the Muslims are not required to eat pork as such, a good deal of the food served at both institutions is cooked in pork grease or fat, and the Muslims cannot always tell what dishes they can eat on a given day without offending the dietary requirements of their faith. The Court also finds that there are some restrictions on the number and places of Muslim meetings which do not exist with respect to other religious groups who are represented in the prison population. And the Court also finds that Muslims are not permitted to use the Christian chapel at Tucker, and that, at least at Tucker, Muslim meetings must be attended by the prison chaplain who is a black man but who is also a Christian. The Court still further finds that for a time at least lists of inmates who attended Muslim meetings were kept and turned over to the Federal Bureau of Investigation.[4]

---

3. There is no substantial evidence that the few Negro employees of the Department practice any discrimination against white inmates.

4. The Court doubts that such lists are now being kept in view of the fact that according to the media the Washington headquarters of the F.B.I. denied following the

The Court does not find that the prison administration has intentionally discriminated against Muslims as such. For example, denial to the Muslims of the use of the chapel at Tucker is attempted to be justified by reference to the small number of Muslims at Tucker and to security problems in connection with guarding a small number of people meeting in a building that is outside the main prison compound. It appears to the Court that some of the difficulties of the Muslims are due to the fact that the prison authorities are simply not familiar with Muslim problems, and that the administration is prepared to meet reasonable Muslim requests for consideration.

The Court is going to enjoin in general terms discrimination against the undue restrictions upon the Muslims. The Court will say, however, that the Court doubts that as of today the Muslims as a class have any real problems that cannot be disposed of administratively. And the Court will observe in this connection that since the hearings were concluded in January of this year it has received no more than a very few Muslim complaints emanating from either Cummins or Tucker except a number that have come from Negro inmates of the maximum security unit at Cummins who are or claim to be Muslims, and whose complaints about religious discrimination the Court considers to be baseless.

(b) In years prior to 1967 the population of both Cummins and Tucker was strictly segregated from top to bottom on the basis of race. By 1970 when Holt II was decided, segregation had been essentially eliminated at Tucker but still existed in large measure at Cummins. The Court discussed the problem in some detail in Holt II, supra, 309 F. Supp. at 381–382, and ordered it elimi-

nated to the extent that it still existed in that institution.

The Court finds that as of now the populations of both institutions are fully desegregated, except that inmates of the maximum security unit at Cummins are still assigned to racially segregated cells.[5] Desegregation of the barracks has been accomplished without the creation of any problems in the areas of security and discipline, and the Court cannot accept the argument put forward by respondents that members of both races cannot dwell peaceably together in the cells in the maximum security unit. And it should be pointed out in this connection that not all of the inmates of the unit have been put there for disciplinary reasons.

This is not to say, of course, that there may not be some inmates, whether white or black, who cannot safely be confined in a cell with a member or members of the other race. In such cases the Constitution does not require assignment to integrated cells. Lee v. Washington, 1968, 390 U.S. 333, 334, 88 S.Ct. 994, 19 L.Ed.2d 1212. But the existing general policy of racial segregation in the maximum security cells cannot be approved and must be brought to an end.

Respondents will be directed forthwith to consider the situations of all inmates now in the unit and determine on an individual basis which of those inmates, if any, cannot safely be put in a cell with a member of the other race. The rest of the inmates presently confined in the unit are to be assigned to cells on a non-racial basis.

No present or future inmate of the unit is to be assigned to a cell on the basis of race unless the Superintendent of the institution personally finds in writing and with a statement of supporting

Court's November 1972 hearings that it was Bureau policy to require the keeping and delivery of such lists.

5. Most of the regular cells at Cummins are occupied by two people, and at times it is

necessary to confine more than two men to the same cell. There are no separate cells in the barracks where inmates in general population reside.

reasons that the inmate in question should not be confined in an integrated cell; such finding is to be made a part of the inmate's prison record.

(c) Passing on to the more general problem of racial discrimination in such fields as inmate classifications, job assignments, personal appearance, privileges, and prison discipline, the Court will say first that the prison rules and regulations do not authorize racial discrimination against inmates and, in fact, prohibit it in the field of language used in addressing inmates. On the other hand, the Employee Handbook (Defendants' Exhibit 4031) which is issued to all employees of the Department and which spells out the Department's rules and regulations as to employee conduct, does not in terms prohibit racial discrimination in the areas now being discussed. Perhaps the author or authors of the Handbook did not consider such prohibition to be necessary.

■ Actually, however, it makes no real difference what the Handbook says or does not say. Racial discrimination between convicts in any form which it may take is unconstitutional and must be eliminated to the extent that it exists.

Racial discrimination can be overt and ingenuous, and that type of discrimination is easy to detect and ought to be easy to eradicate. On the other hand, such discrimination may be covert, subtle, or even unconscious. That kind of discrimination is extremely hard to establish and may be extremely hard to get rid of. The problem is complicated by the fact that the appearance of racial discrimination may be present even if the reality is not, and until such appearance is eliminated to the greatest extent possible, race relations in a prison will not be good.

As has been seen, the proportions of blacks and whites in both institutions are just about equal. It must be recognized, however, that the general educational, vocational, and cultural levels of the black inmates as a class are substantially lower than the corresponding levels of the white inmates. And it is possible that black inmates confined in an integrated institution which is administered by white personnel may create administrative problems disproportionate to their numbers.

The Court does not find from the evidence that any open or gross discrimination against black inmates exists at either Cummins or Tucker, except to the extent that the maximum security cells are still segregated. But the Court is not at all sure that there is not some covert discrimination in the areas of classifications, job assignments, and punishments.

With particular regard to punishments, the Court does not have before it a substantial body of statistical material relating to Tucker, but it does have monthly operating reports from Cummins covering the months of June through November, 1972, and the last of those reports (Defendants' Exhibit 3018) also contains information covering the first eleven months of that year.

A consideration of those reports leads the Court to conclude that a black inmate accused of a disciplinary violation is as likely to be found not guilty or to receive a mild sentence as is a white inmate. But when we come to severe penalties, such as reductions in classification, adverse changes in job assignments, loss of good time, and confinement in punitive isolation, the Court is impelled to the view that a black inmate is more likely than a white inmate to be subjected to such penalties, and if he is sentenced to punitive isolation, he is likely to stay there longer than is a white inmate.

That black inmates may receive more severe sentences than white inmates does not necessarily justify the inference that white members of Disciplinary Committees are intentionally discriminating against blacks in the area of prison discipline. As has been suggested, black inmates in the environment of Cummins and Tucker may as a class present more serious disciplinary prob-

lems than do whites as a class and may deserve more severe penalties, although the Court does not so find. Moreover, in view of long held and deep seated racial attitudes, words or acts, if said or done by blacks, may be simply more offensive to some white members of disciplinary panels than are similar words or acts of white convicts. And white prison administrators sitting in judgment on black inmates actually may not consciously be aware that their reactions to rule violations by blacks, as opposed to whites, may constitute a form of discrimination against the former.

Looking at the question of job assignments, there are two things that must be recognized. First, it is probably safe to say that the majority of black inmates at both institutions are not qualified to do anything but work involving more or less arduous physical labor. Second, from an inmate's standpoint a comparatively low status job may be easier than a job of higher status or may have some fringe benefits not attached to a more highly rated job and thus more desirable than some other task which the inmate might be capable of performing.

When those things are borne in mind, the Court cannot find that blacks, as a class, are intentionally assigned to menial or disagreeable jobs while whites are intentionally assigned to "better" jobs. And if one looks at what is probably the lowest prison job, namely, manual agricultural labor as a member of a "hoe squad", the Court concludes that about as many white inmates as blacks are assigned to such jobs.

On the other hand, the Court is not persuaded that the white members of Classification Committees are doing as much as they could and should to classify inmates and to assign them to work on the basis of qualifications. It would appear to the Court that Negroes should occupy some job slots that they are not now occupying, and that certain categories of jobs should have more than their present number of ' lack assignees.

Apparent racial inequities in punishments, job assignments, and other aspects of prison life relate not only to the actual existence of racial discrimination but also to the appearance of such discrimination. And it should be obvious that apart from any question of constitutional law black inmates will make a better adjustment to prison life and will conform better to prison routine and requirements if they believe affirmatively that members of their race are being treated fairly and without discrimination on account of race.

The Court's previous decrees will be supplemented so as to enjoin racial discrimination in any form and in all areas of prison life. However, the Court is not willing to leave this subject without some suggestions to respondents as to what can and should be done to alleviate the racial situation in the Department.

To start with, existing prison rules about employee language should be enforced rigorously and higher echelon personnel should set an example to their subordinates.

Second, positive rules prohibiting racial discrimination should be formulated and published. Employees at all levels must be made familiar with those rules, and must be made to realize that if they want to keep their jobs, they must abide by the rules.

Third, and this is extremely important, more black employees should be recruited, and blacks should be assigned to meaningful positions of authority, including assignments to Classification and Disciplinary Committees.

Not any of those things will be easy to accomplish, and the accomplishment of the third one may be the most difficult of all. The Court realizes that qualified blacks who are willing to fill positions of responsibility and authority in prison administration may be in short supply. Other more appealing positions are open to them in today's society. But, the difficulty of hiring qualified blacks should certainly not deter respondents from trying to do so.

### III.

The Court considers next the question of the constitutional acceptability of the disciplinary procedures employed in the Department with respect to inmates who violate prison rules, or who refuse to work, or who loiter at their tasks. The racial aspect of prison disciplinary procedures in the Department has been examined already and will not be referred to in this section of the opinion.

All inmates upon entering the Department are exposed to a period of "orientation," and are furnished with an Inmate Handbook. A copy of that Handbook, revised to November 1, 1972, is in the record as Defendants' Exhibit No. 4023.[6]

The Handbook, among other things, advises the inmate of the types of conduct that may bring on disciplinary proceedings against him, the punishments that may be imposed, and disciplinary procedures that are to be followed if charges are filed. There are 25 listed offenses and 11 possible punishments which may be imposed singly or in combination.

Some of the sentences are relatively mild; others are quite severe. The severe penalties include loss of good time, reduction in classifications, extra duty, job changes, and confinement in punitive isolation. Another severe penalty is a postponement of an inmate's appearance before the Board of Pardons and Paroles for a period of not less than three nor more than six months.

· Each of the two units of the Department has a Disciplinary Committee consisting of four men; however, the Committees may and usually do sit in panels of three. Each Committee has a Chairman and a Vice Chairman and two ordinary members who may be replaced from time to time. The Assistant Superintendent of the institution is Chairman of the Committee, and the Chief Security Officer of the institution is the Vice Chairman. A Shift Supervisor, Security, serves as one ordinary member, and a member of the treatment staff of the institution serves as the other ordinary member.

The rules provide that an inmate charged with a violation is to be brought before the Committee and is to be afforded an opportunity to give his version of the episode leading up to the charge. Other witnesses may be called in the discretion of the Committee. The inmate is not entitled to representation at the hearing, and he is not in terms accorded any right of confrontation or any right to call witnesses to testify in his own behalf.

After the Committee concludes a day's work, it reports its actions to the Superintendent for approval. If the Superintendent notes his approval, the report is forwarded to the Commissioner. While the Superintendent is required to approve the actions of the Committee, it does not appear to the Court that he is required to review specific actions taken by the Committee, although the Court is sure that he does so in some instances.

An inmate who is dissatisfied with a decision of the Committee may appeal in writing to the Superintendent and from him to the Commissioner. It is provided, however, that if the inmate wilfully and knowingly makes false statements in connection with an appeal, or wilfully tries to mislead or deceive the Superintendent or the Commissioner, his action in itself constitutes a major disciplinary offense.

The proceedings of the Committee in a given case are reflected in a document entitled "Disciplinary Report." The Court has seen quite a number of those reports which are made on mimeographed forms. The forms identify the accused inmate, identify the offense and the employee filing the charge. There is a space entitled "Offense in Detail." That space is filled out by the charging employee and signed by him. Next comes a much narrower space entitled

---

6. Such a handbook may be of little or no value to an illiterate inmate or to one with a limited ability to read.

"Statement of Inmate to Committee." It is not clear whether the inmate is permitted to fill this space out himself; more probably, the substance of his statement, if any, is written down by a committee member; the inmate may or may not sign the statement. It appears that an inmate is required to plead either "Guilty" or "Not Guilty" to the charge. The report notes the inmate's attitude as being either cooperative, uncooperative, or hostile. The members of the Committee are then identified. The decision of the Committee and the sentence imposed are shown on the report, and the document is signed by the Chairman and by the Superintendent.

██ As the Court of Appeals for this Circuit has recently pointed out, the law as to what procedural due process requires with respect to a prison inmate charged with a violation of prison rules is in a state of flux. Remmers v. Brewer, 8 Cir., 1973, 475 F.2d 52, 54; Dodson v. Haugh, 8 Cir., 1973, 473 F.2d 689. It is clear that such an inmate is not entitled to a full fledged judicial trial or to all of the guarantees and protections afforded by the Fourteenth Amendment to a person charged in court with a criminal offense. On the other hand, he is entitled to be advised of the charge against him, and to be heard, and to have his case considered seriously, dispassionately, and objectively, although he naturally cannot expect an "impartial" fact finding body in the sense that a criminal defendant is entitled to an "impartial" jury.

The Department's procedures themselves are probably not ideal, and the Court is troubled by the fact that the Committees seem to be rather heavily weighted in favor of what may be termed the "prosecution." It should be observed, however, that substantial numbers of inmates are acquitted or receive mild punishments, and that probably the vast majority of inmates accused of disciplinary violations are guilty, just as the majority of persons accused of crime in the outside world are guilty.

██ The Court thinks that the procedures in question would pass constitutional muster if they were properly administered, and if the Committees were willing to spend some time on individual cases and to make considered, rather than perfunctory, determinations of guilt or innocence, would make clear to the accused what the charges against him are, and what his rights are, and what the consequences of conviction may be, and would adopt an attitude that would encourage an accused inmate to state his side of the case, if he has one.

Unfortunately, the procedures are not so administered. On the contrary, in a given case the Committee tends to act summarily and in a very short space of time, and it may display an attitude of hostility toward the inmate calculated to intimidate him and suppress his version of the incident involved.

The Court is under the impression that disciplinary hearings frequently are held at night, and if the Court is correct in that impression, the night sessions may be part of the trouble with the administration of the procedures. Some or perhaps all of the members of the disciplinary panel probably have been working all day, and they want to go home. That is understandable, but it does not contribute to the proper administration of prison justice.

██ The Court is going to issue three directives in this area: (1) The rules provide that the Committees are to perform their functions "as quickly as possible." The Court is going to make that requirement more specific by requiring that in cases other than highly exceptional an accused inmate must be given a hearing within 72 hours after the occurrence of the disciplinary episode. In exceptional cases limited extensions of time may be granted by the respective Superintendents. (2) Insofar as possible hearings are to be conducted between the hours of 6 A.M. and 6 P.M. It occurs to the Court that this will not only improve administration of the procedures but may also suggest to respondents that the Committees be restruc-

tured so as to include more noncustodial personnel who may be available during ordinary business hours but not at night. (3) All hearings must be reported in such manner that if the occasion arises a reviewing authority, including a court, may determine exactly how much time was taken at the hearing and essentially what was said and done by the individuals involved. This means, of course, that the tapes or transcripts of the hearings must be preserved for at least a reasonable time after the hearings take place.

With regard to the reporting of disciplinary proceedings the Court is advised that as of the present time disciplinary proceedings are being taped, and that tape recordings are also being made of certain types of interviews of prison officials with inmates. Assuming of course that the recordings are complete and accurate, the practice should be of value in dealing with inmate complaints about disciplinary proceedings and certain other types of inmate complaints.

As mentioned, one of the punishments that may be imposed on an inmate is confinement in isolation. At Tucker that confinement is in individual cells that were used for years for the confinement of persons convicted of capital offenses and condemned to die. At Cummins the confinement is in cells in the maximum security unit. The Court finds that the cells are not overcrowded, that they are properly lighted and ventilated, and that confinement in them does not constitute any violation of the Eighth Amendment's prohibition of cruel and unusual punishments. As in years past, convicts confined in isolation have a restricted diet consisting of a food substance known as "grue," which is nourishing but tasteless; however, a convict confined in isolation receives a regular meal every third day. In earlier stages of the litigation the Court concluded that "grue" is not unconstitutional, and it adheres to that view.

Before leaving this phase of the case, the Court desires to comment briefly on conditions of confinement in the maximum security unit in general. An inmate is placed in the unit either as a disciplinary measure, or for his own protection, or for purposes of "administrative segregation." While it appears to the Court that some of the conditions of confinement in the unit are perhaps somewhat more rigorous than may be absolutely necessary, the Court does not find that those conditions are such as to render confinement in the unit unconstitutional.

A word needs to be said about the "quiet" cells in the maximum security unit. Those cells which are soundproof are located in the middle of the building; each one of them has a double door; when the outer door is closed, the inmate is in complete darkness. The cells are essentially devoid of furniture and fixtures; bedding is not supplied. As the Court recalls, there was a somewhat excessive use of the quiet cells soon after the maximum security unit was activated, but the Court finds that as of now the cells are not used excessively or in an inhumane manner. Use of the cells is limited to violent inmates who cannot be controlled in any other manner, and usually an inmate's stay in a quiet cell is quite brief. Further, it is not uncommon for an inmate to be placed in a quiet cell without being placed in darkness; the outer door of the cell is simply left open.

One problem in the field of disciplinary procedures that calls for comment arises out of the fact that at times it is necessary for purposes of discipline and good order to transfer young inmates from Tucker to Cummins, and at times emergency situations arise in which it appears necessary to the authorities at Tucker to move a young inmate or young inmates immediately. The Court has no trouble with such transfers, including emergency transfers, because the Court knows that young convicts can and frequently do present serious disciplinary and other problems and at times are more violent and irresponsible than

older convicts. What does trouble the Court is what happens to a young inmate after he goes to Cummins.

Evidence taken in November of last year described an illustrative case. In early 1972 authorities at Tucker had cause to believe that a number of youths confined there were planning to incite a riot or promote a sit down strike. This information was obtained during the late afternoon or night of a particular day, and the riot or sit down strike was supposed to take place the next morning. The young men were summarily moved in the night time from the one institution to the other, and at the time of the November hearing one of them was still there.

There are educational and vocational facilities at Tucker that are not available at Cummins, and many of the inmates of Cummins are hardened criminals with whom a youth of comparatively tender years should not be confined any longer than reasonably necessary. As has been pointed out, there is as yet no minimum security unit at Cummins, and young convicts sent down from Tucker have to be confined either in the maximum security unit or in the barracks among the general prison population. Confinement in neither place is desirable for a young convict, and it is hard to tell which is worse.

The Court finds that prior to the November hearing there was no set policy with respect to getting young transferees back to the milder regime at Tucker, and that nobody seemed to care particularly whether or when a young transferee was retransferred. That situation gave the Court a serious problem, particularly in view of the contention of counsel that a young Arkansas convict has a constitutional right not to be unreasonably deprived of opportunities for improvement that exist at Tucker.

Following the November hearings Commissioner Hutto issued a Policy Memorandum which addressed itself to the problem. The Memorandum provides in substance that in other than emergency situations inmates are not to be transferred from Tucker to Cummins without a hearing before the Tucker Disciplinary Committee or the Tucker Classification Committee, or both, and that after prisoners reach Cummins their cases are to be evaluated every 90 days by the Cummins Classification Committee with the end in view of getting them back to Tucker as soon as possible. If a Tucker inmate is transferred in an emergency situation, he is entitled to a hearing before the Cummins Classification Committee within 72 hours of his arrival at Cummins. All transfer and retransfer decisions may be appealed to the Commissioner by the affected inmates.

Subject to one qualification the Court finds that the Commissioner's Memorandum appears to solve the problem satisfactorily. The Court does not think the Cummins Classification Committee should wait 90 days before reviewing the case of a transferree because it may not take the transferee 90 days to realize the error of his ways and to become ready to behave himself if sent back to Tucker. The Court thinks that the first evaluation should be not later than two weeks after the transferee arrives at Cummins, and that a second evaluation should not be later than 30 days after the first one. If by that time the transferee is not ready to go back to Tucker, the Court thinks that later evaluations at 90 day intervals are adequate.

The Commissioner will be directed to amend his Memorandum accordingly. Of course, it goes without saying that authorities at Cummins will take proper precautions for the safety of young transferrees while they are confined at Cummins.

## IV.

Before discussing claims of abuse of inmates, the Court will take up the question of the validity of institutional rules governing inmate correspondence, a question that actually is of interest to

only a small number of inmates who desire to engage in correspondence of which the Department disapproves.

■■■■ As the Court understands the state of the law in this field today, a prison inmate has a practically unrestricted right to correspond privately with courts and with his attorney. His right to correspond generally with people in the outside world is by no means so unfettered; that right is subject to reasonable regulation and restriction. However, the right of prison authorities to control and regulate inmate correspondence of a general type is not as broad as it was considered to be in prior years. Today, prison restrictions on inmate correspondence must be related to a legitimate institutional interest, and at times the validity of a given restriction must be determined by balancing the interest of the institution in maintaining it against the interest of the inmate in being free from it. See e. g. Woods v. Yeager, 3 Cir., 1972, 463 F.2d 223; Goodwin v. Oswald, 2 Cir., 1972, 462 F.2d 1237; Wilkinson v. Skinner, 2 Cir., 1972, 462 F.2d 670; Moore v. Ciccone, 8 Cir., 1972, 459 F.2d 574; Burns v. Swenson, 8 Cir., 1970, 430 F.2d 771; Lee v. Tahash, 8 Cir., 1958, 352 F.2d 970; Carey v. Settle, 8 Cir., 1965. 351 F.2d 483.

Under the rules of the Department appearing at Pages 42–44 of the Inmate Handbook as supplemented by a later Policy Memorandum, inmate correspondence is divided into three classes, privileged, general, and special purpose. The principal complaints in this area go to the rules relating to general correspondence. No attack is made on the rules relating to special purpose correspondence, and the attack on the privileged correspondence rules is limited.

Taking up, first, the attack on the privileged correspondence rules the Court finds that all outgoing inmate mail to judges, court officials, lawyers, and certain other categories of addressees can be sent out of the institutions sealed; such letters are not opened, inspected, or read. Incoming privileged correspondence, with certain limited exceptions, including letters from the federal courts, is subject to being opened and inspected for contraband, principally money that an attorney, unfamiliar with prison rules, might undertake to send to his client.

The specific complaint about privileged correspondence with which the court is concerned is that, as just stated, incoming letters from lawyers may be opened. The Court does not consider that any lawyers of common sense would put anything in a letter to a convict client that the lawyer did not want to be read by prison authorities, but the Court can easily see how a lawyer might mail his client a check, money order, or currency. It has long been prison policy to prohibit inmates from having in their possession what is called "free world" or "green" money. The reasons for the prohibition are obvious. An inmate with currency in his possession may be the subject of attack by other inmates; an inmate with funds is in a better position after escape than an inmate who has no money; the money in the possession of an inmate may be used to bribe guards or other prison employees.

■■■■ The Court thinks that the rule in question is a reasonable one, and with one modification the Court approves it. The modification is that if prison authorities desire to open and inspect the contents of a letter to an inmate from a lawyer, they should do so in the presence of the inmate so that he will know that the letter has not been read. Compliance with this requirement should not be unduly burdensome.

The Court finds it unnecessary to describe all of the Department's rules dealing with general correspondence. They are doubtless stricter than those that prevail in some jurisdictions and doubtless more liberal than those that prevail in others. In general, they closely track the recommendations of the Association of State Correctional Administrators which appear in a bulletin or handbook entitled "Uniform Correctional Policies

& Procedures." The Court observes that Commissioner Hutto is a member of that Association.

Two provisions of the general correspondence rules are attacked here: First, complaint is made that outgoing correspondence may be opened, inspected, and in instances read. Second, complaint is made about general correspondence being limited to persons whose names appear on individual mailing lists which are subject to the approval of the Department.

As to outgoing correspondence, respondents concede that there is no real reason to examine such correspondence for contraband. The Department's trouble with contraband relates to that which comes into the prison rather than to the possibility that inmates will smuggle something out. Thus, the rule cannot be justified on that basis.

However, if an inmate is permitted to send out sealed and unexamined general correspondence, there is always the possibility that he will take advantage of the opportunity to plot an escape or to counsel with the addressee about outside criminal conduct. It is evident that respondents do not claim any right to read all outgoing correspondence, and the Court is sure that the mail room personnel do not do so. The Court doubts that they even examine a great many of the outgoing letters. The Department does reserve the right to read letters in instances where there is reason to believe that a letter may constitute a "clear and present danger" to the security of the institution.

■ The Court finds that the rule permitting the examination and limited reading of outgoing general correspondence is reasonable and not unconstitutional.

The attack on the mailing list requirement has three aspects. First, it is contended that respondents have no constitutional right to limit the general correspondence of an inmate to persons approved by the Department and whose names appear on the inmate's mailing list. Second, complaint is made that before approving persons for inclusion on a mailing list, the Department sends a questionnaire to the prospective correspondent and also makes certain limited inquiries of local law enforcement officers as to the proposed correspondent's criminal record and connection with drugs. One reason for such inquiries would appear to be that persons on an inmate's mailing list are likely to desire to visit him at the prison from time to time in accordance with prison rules governing visitation. Third, an adult person will not be included on an inmate's list without the consent of the proposed correspondent, and in the case of a proposed correspondent under the age of 18 the consent of a parent or guardian must be given; and it is claimed that this provision is unconstitutional.

As to the first and second claims, the Court notes to begin with that there is no limit to the number of names that an inmate may include on his list, that his list may be changed from time to time, that correspondence between the sexes is permitted, and that the fact that a proposed correspondent has a criminal record does not in and of itself make that person ineligible for inclusion on the list. In general, inmates are permitted to correspond with their close relatives and with anyone else with whom they may have legitimate business.

■ The Court rejects the claim that respondents may not constitutionally limit the correspondence of an inmate to persons the inclusion of whose names on the inmate's list has been approved by the Department. And the Court thinks that if approval is to be given or withheld intelligently, the Department has a right to find out something about the people with whom the inmate desires to correspond. The Court does not consider that the questionnaires and inquiries addressed to law enforcement officers are designed or calculated to inhibit seriously correspon-

dence with free world people with whom an inmate has a legitimate reason to correspond.

The Court suspects that a good deal of the dissatisfaction in this area stems from the fact that some inmates do not understand the mailing list requirement, and do not understand that adding names to the list or making changes in the list may take some time. Like many people in the free world, inmates tend to want instantaneous gratification of their wants and tend to complain when they do not receive it.

 So, the first two attacks on the mailing list requirement are rejected. The third ground of attack is more troublesome, as far as adults who are prospective correspondents are concerned. The Court has no trouble with the requirement that the parent or guardian of a young person give his approval before that person's name is included on the list.

As to adults, the case is somewhat different. The requirement that an adult give his consent to be included on an inmate's mailing list is obviously designed to protect the former from unwanted mail communications. There are many reasons why a person in the outside world may not want to receive letters from a convict, even though he may be a close relative, spouse, or former spouse. Such a person may welcome a prison rule or policy which will insulate him or her from such correspondence. And the willingness of prison administrators to provide such insulation in the interest of public relations or for other reasons is understandable.

The problem of unwanted correspondence, of course, is not limited to situations in which the mailer of the letters is confined in prison. Whether the mailer is inside or outside of a penal institution, a person who does not want to read his letters need not do so. Letters can be thrown away unread or returned unopened.

The Court observes that the publication "Uniform Correctional Policies & Procedures," which has been mentioned, recognizes the propriety of requiring approved mailing lists, and the propriety of limiting an inmate's correspondence with a juvenile to cases in which the consent of the juvenile's parent or guardian is forthcoming. The publication says nothing about any requirement that an adult give his permission before having his name included on an inmate's list.

 The Court is of the view that the requirement just discussed is really not necessary and might be dispensed with readily, but the Court does not think that it presents a problem of constitutional dimension and is not prepared to strike it down.

Before leaving this particular aspect of the case the Court would emphasize that prison mail room employees ought to understand the rules thoroughly themselves and faithfully follow them, and that they should realize that many inmates of both Cummins and Tucker are not highly literate or intelligent people, and where necessary the employees should spend a little time with inmates having correspondence problems and explain to them in terms that they can understand just what they can do and what they cannot do, and the procedures to be followed in getting a name on a mailing list or in making changes in a list.

## V.

Much of the testimony that the Court heard related to claims of petitioners that they are habitually harassed, retaliated against, and physically and verbally abused by prison personnel. Such claims would be significant if made in connection with any prison, but they are particularly significant here in view of the long history of brutality to inmates of both Cummins and Tucker that was practiced for so many years and that has been described in detail in earlier opinions of this Court and of the Court of Appeals.

The Court finds, first, that it is not the policy of the Department to abuse

inmates in any way or to treat them brutally or abusively. The rules of the Department appropriately limit the use of force on inmates to situations in which the use of force is both legitimate and necessary and specify that the force used must not in any event exceed the reasonable necessities of a particular case. The rules also prohibit the use by employees of vulgar, profane, or insulting language to inmates. And the Court thinks that it is safe to say that if an inmate, whether white or black, of either institution behaves himself and does the work assigned to him to the best of his ability, he will be able to do his time without serious difficulties as far as prison personnel are concerned.

However, the prison staff is required to deal constitutionally not only with tractable inmates but also with inmates who are not so tractable, and there are many inmates who fall within the latter category. Those inmates make a great deal of trouble for themselves. While they are quick to assert what they consider to be their rights, they have little regard for their obligations as inmates. They refuse to obey orders, they loiter at their tasks or positively refuse to work; they fight with each other; and they curse and abuse and sometimes assault or fight with their keepers. Indeed, some inmates appear at times to deliberately engage in conduct which they know will result in the use of force upon them.

In view of such inmate conduct, it is not strange that the relations between prison personnel, on the one hand, and certain inmates, particularly those in the maximum security unit, are bad, to put it conservatively. As indicated, much and perhaps most of the blame for such relations should be laid at the door of the inmates, but at times unprofessional reaction of prison employees to situations of stress is at least a contributing factor. In this overall problem area, as in other areas of prison life, the ultimate answer may lie more in the upgrading of prison personnel than in anything else.

At one time or another inmates of the respective units have charged those in authority over them with every kind of abuse that the inmate mind can imagine. No effort will be made to list, let alone discuss, all of the charges. The Court will confine itself to the principal ones and will start with complaints about working conditions.

While the Court finds that many of the inmates, particularly those assigned to the "hoe squads," are required to work long hours and to work hard, the Court does not find that prison working conditions are so harsh or adverse as to constitute cruel and unusual punishment. Now, the Court does have some trouble with the possibility that at times inmates may be assigned to work that is beyond their strength, or that is medically contraindicated, and that older inmates may be required to try to keep up with younger inmates which they sometimes cannot do. However, the Court does not find that those things are done deliberately or wilfully, and the Court thinks that to the extent that they are done they symptomize simply poor communication and administration. It has been pointed out that the Department has now been able to employ a full time physician who will doubtless evaluate inmates with respect to the types of work that they are able to do, and the Classification Committees and supervisory employees will be expected to pay heed to what the doctor orders or recommends.

With further regard to working conditions, it has been alleged that inmates are forced at times to run to and from work or while at work, or that one crew has been required to race with another crew in the performance of the same type of work. The Court does not find that such practices have ever been employed generally, but the evidence in the overall litigation has reflected that there have been instances in which inmates have been required to run in front of moving vehicles or ridden horses. It is hardly necessary for the Court to say that such practices cannot be tolerated,

and it is the responsibility of respondents to prevent them.

The Court takes up next the claim of inmates that prison personnel at all levels employ toward inmates profane, threatening, abusive, and vulgar language which is replete with racial slurs and epithets and sexual and scatological terms. As indicated, prison rules specifically prohibit the use of language of that kind.

The Court is sure that the inmates of both institutions in their own speech use language of the types of which they now complain, and in view of the quality of prison personnel that we have in the Department at this time, the Court knows as a matter of common sense that at least some employees on occasion do use profane or "gutter" language when addressing inmates. and that the objectionable language may include offensive racial and other allusions.

The Court doubts that prison employees use language of the types in question to the extent that such use, standing alone, would present a substantial constitutional problem, but its use, to the extent that it is in fact employed, can contribute to problems that do have constitutional significance. In any event, the use of objectionable language by members of the prison staff, of whatever rank, is completely unnecessary, is unprofessional, and can cause serious trouble. The Court is going to expect higher echelon personnel to set an example for their subordinates in this field, and to enforce the institutional rules that have been mentioned.

 Before leaving this subject the Court notes with approval that the prison rules not only prohibit profane and similar language but also admonish employees not to be overly familiar with inmates and that undue familiarity "decreases the effectiveness of an employee as well as sometimes placing the employee in a compromising position." Those admonitions are salutary indeed and should be observed. The Court suspects that many complaints of inmates about language are afterthoughts, and that some of the words involved may have been used, if at all, in jest or flippantly and without realization that they might give offense. Employees of the Department today simply cannot afford to joke or jest coarsely with inmates, particularly black inmates who, whether rightly or wrongly, are obviously "up tight" and prone to take offense.

The Court's Supplemental Decree herein specifically enjoins prison personnel from retaliating against or threatening to retaliate against any inmate for having petitioned for judicial relief or for having testified or for having offered to testify in any judicial proceeding. Despite inmate claims, the Court is not able to find from a preponderance of the evidence that there has been any substantial amount of retaliation or threatened retaliation, and, on the other hand, the Court suspects that some writ writers, witnesses, and potential witnesses have been permitted to take liberties that they otherwise would not have been allowed to take because prison personnel have feared being charged with retaliation. However, in the course of this litigation the Court has seen some indications that in instances some reprisals have been taken against inmates who have testified in this Court. There have been some job changes and disciplinary proceedings that have followed with suspicious closeness the appearances in court of certain inmate witnesses.

The Court's injunction in this area is as specific as it can be made, and further discussion of the subject in this opinion would not be profitable. If a serious question of retaliation arises in the future, it may well be considered in the context of a contempt proceeding.

This brings us at length to inmate claims that they are subjected to unnecessary and unreasonable force. Respondents naturally deny that that claim has any basis, and point out the fact that in instances where employees have been found to have used unnecessary or excessive force they have been discharged or otherwise disciplined.

The Court recognizes at the outset that at times force has to be used by prison personnel on recalcitrant inmates, and that an inmate who has been the subject of force is not likely to concede that its use was necessary or that the amount used was reasonable. The Court also recognizes that an employee charged with improper use of force is not to be judged by hindsight but in the light of facts and circumstances as they reasonably appeared to him to exist at the time.

Force is used from time to time at both Cummins and Tucker, as it is in prisons all over the United States. It is properly employed in self defense, in breaking up fights between inmates, in compelling obedience to lawful orders where milder measures fail, in protecting State property, and in connection with preventing escapes and at times in connection with recapturing escaped convicts.

The force employed by Department personnel is largely simply manual force, but at times striking weapons such as "slappers" must be used. At other times subduing chemicals such as "mace" may be employed. Occasionally, firearms have to be used to break up fights, or to prevent escapes, or in connection with the recapture of escaped inmates. Generally speaking, the use of firearms involves nothing more than the firing of warning shots to induce inmates to stop fighting or to stop trying to run away.

The majority of incidents involving use of force take place in the maximum security unit at Cummins, as might be expected. However, incidents occur in the barracks in both institutions, and in the fields, and in other prison areas. But such incidents do not occur every day or with great frequency. A number of the incidents occurring in the maximum security unit have involved extremely violent and unstable inmates, and some inmates are involved repeatedly in such incidents.

As far as incidents of force in the maximum security unit, the barracks, and the fields are concerned, the Court simply does not find that the problem is as serious as the inmates would make it. While the Court suspects that some of such incidents were unnecessary, and that employees may have over reacted in certain situations, the Court finds that by and large the inmates who have been subjected to force have brought it on themselves, and that in general the degree of force used has been in reasonable proportion to the violence displayed by the inmates involved.

The Court does find that there have been instances in which unnecessary and unreasonable force has been used on escapees after their recapture and after they ceased to be a source of any real danger to their captors. And Superintendent Britton was involved personally in two of such incidents.

The Court realizes that escapes and recaptures can be and frequently are irritating and exasperating to prison administrators and lesser personnel, particularly where as occasionally happens the escape involves a breach of trust reposed in an inmate, as where he does not return to the prison at the expiration of a furlough. And the Court realizes that at times inmates resist recapture and have to be subdued forcibly. But, people who are engaged in custodial work must learn to take such episodes in stride and must learn to control themselves. And there is simply no excuse for hitting, slapping, or kicking an escapee after he has been recaptured and reduced to subjection.

The record reflects that after the November 1972 hearings were concluded, the Commissioner issued a Policy Memorandum dealing with procedures to be followed after an escapee has been recaptured. Those procedures are designed to determine whether the inmate was injured in connection with his recapture and whether improper use of force was made in connection with the recapture. Hopefully, that Memoran-

dum will be of value in solving problems arising out of escapes.

The Court has considered the body of evidence dealing with the use of force, and does not consider that it calls for any drastic action at this moment, although the Court is going to make its injunction somewhat more specific than it is in defining what the Court will consider to amount to a cruel and unusual punishment.

▆▆▆ There is one thing that the Court is going to suggest strongly that Mr. Lockhart and Mr. Britton do in connection with incidents of force. If such an incident results in a disciplinary proceeding against the inmate, as many of such incidents do, there is an opportunity in the course of the proceedings to develop the facts of the incident more or less contemporaneously. But all incidents of force do not result in disciplinary proceedings, or at least the Court is of that impression. The Court thinks that it would be highly desirable for such incidents to be investigated at once, and that the investigations should include the development, where possible, of the inmate's version of the event. Many of the complaints that the Court receives about violence practiced upon inmates have been prepared by writ writers and signed by the complaining inmates. What a writ writer puts into his writ may be nothing in the world but the product of his own imagination, and the allegations of the writ may have little or no resemblance to what the complainant actually recalls about the incident or to what he would have said about it if interviewed at the time. The value of the Court's suggestion to prison personnel ought to be apparent to them without further elaboration.

### VI.

Another supplemental decree in accordance with the foregoing will be entered, and respondents and all Department personnel from the highest in rank to the lowest will be expected to comply with it and with the earlier decrees that have been entered in this litigation.

▆▆▆ However, in view of the marked improvements that have been made in the Department and that are continuing to be made the Court does not consider it either necessary or desirable to retain further supervisory jurisdiction with respect to the Department and such jurisdiction will not be retained. Let the Court hasten to add that this release of jurisdiction will not impair the validity and continuing effect of its injunctions, and if those injunctions are violated, those guilty may be faced with contempt proceedings either civil or criminal.

The Court hopes that this will be the last long opinion dealing with the Department that the Court will be called upon to write. But the Court knows that regardless of what has been said here, and regardless of what its decrees may forbid, or command, and regardless of how diligently respondents may seek to obey the orders of the Court or to follow the Court's suggestions, inmate complaints are going to continue to be received by the Court.

Judging from experience, many, if not most, of those complaints will be insubstantial from a constitutional standpoint, and can be ignored or disposed of summarily. Some can be handled administratively, as a number have been over the past year; and the Court will say at this point that it would be most desirable if the Board and the Commissioner could work out a grievance procedure that will be effective and readily available to inmates who have or think they have legitimate grievances. Should such a procedure be evolved, the Court might well be inclined, to the extent legally open to it, to refuse to consider inmate complaints until that procedure has been exhausted.

But, there will be complaints that cannot be brushed aside and that cannot be mediated. Those complaints will require formal judicial determinations. Some, if found meritorious, may call for further injunctive orders; in connection with others the Court may find it neces-

sary or desirable to impose sanctions for violations of existing decrees.

The Court does not now foresee that circumstances will arise which would require the Court to impose the ultimate sanction available to it, that of closing one or both of the prisons or enjoining the further reception of inmates at one or both institutions. Less rigorous, but effective, sanctions are available. The Court can direct the discharge of offending employees; the Court can punish for contempt, and it can award attorney's fees and expenses of litigation. So far, the Court has avoided the imposition of sanctions and hopes that it will not have to impose any in the future; but, the sanctions are at hand, if needed.

## VII.

Finally, there remain to be considered the question of the allowance of a fee to counsel for respondents and the form of the supplemental decree to be entered pursuant to this opinion.

Messrs. Holt and Kaplan have requested that they be allowed a fee and that they be reimbursed for what they have paid to four law students for assistance in working up these cases. The Court thinks that their request should be granted not by way of punishment or sanction but in recognition of the fact that they have performed valuable services not only to the inmates and to the Court but to the people of the State of Arkansas as well. The Arkansas prison system belongs to the people of this State. They have an interest in their prisons being brought up to constitutional standards and properly administered; and they have an interest in full disclosures about their prisons and conditions and practices therein. Counsel for petitioners have certainly advanced those interests.

Considering the amount of time and effort that counsel have expended in this case, the Court thinks that they are entitled to substantial compensation, and that a fee of $8,000.00 should be award-

ed to them jointly; they can divide it between themselves in any manner they see fit. The amount paid to the law students totals $502.80, and reimbursement to counsel to that extent will be allowed. The members of the Board will be directed to make those payments out of available Department funds as soon as possible.

The decree to be entered will be entitled "Second Supplemental Decree." It will be self explanatory; in places it will refer to specific sections of this opinion. As in the case of earlier decrees, it will be applicable to all members of the Board of Correction, to the Commissioner, the Superintendents, the Assistant or Associate Superintendents, and to all subordinate employees of the Department.

As has been said, the Court does not find that individual petitioners are entitled to specific individual relief, but all inmates are entitled to the benefits of the decree. Since this is so, the Court is going to dismiss all of the individual cases except the anchor case of Holt v. Hutto, PB–69–C–24.

The decree to be entered will of course be appealable. Respondents may appeal, or the inmates as a class may appeal, or individual inmates may appeal from the decree to the extent that it dismisses their individual cases or fails to award them specific individual relief. The Court thinks it safe to assume that any inmates desiring to appeal will wish to do so in forma pauperis. Notices of appeal should be lodged with the Clerk of this Court not later than 30 days after the decree is filed, and the Court will not be inclined to allow belated appeals.

The Court now requests either Mr. Holt or Mr. Kaplan or both to visit the prisons as soon as possible after the decree is filed and discuss the matter of appeal with individual petitioners. If an individual petitioner wishes to appeal and wants the Court to make specific findings in his case, the Court will do so to the extent that it is able to do so from the record. The Court might point

out, however, that not all of the individual petitioners were called as witnesses, and no specific testimony was taken with respect to certain individual cases.