Robert FINNEY et al., Appellants,

v.

ARKANSAS BOARD OF CORRECTION
and Terrell Don Hutto et al.,
Appellees.

James C. ELLINGBURG, Appellant,

v.

Douglas NOLAN, Individually and as an
Employee of the Cummins Unit, Ark-
ansas Department of Correction, Appel-
lee.

James C. ELLINGBURG, Appellant,

v.

Kenneth G. TAYLOR, Individually and as
a Correctional Officer, Arkansas Board
of Correction, et al., Appellees.

James C. ELLINGBURG, Appellant,

v.

Dan SEWELL, Individually and as a Po-
lice Captain, Texarkana, Arkansas,
Police Department, et al., Appellees.

James C. ELLINGBURG, Appellant,

v.

Terrell Don HUTTO, Commissioner of
Correction, State of Arkansas, et al.,
Appellees.

Nos. 73-1745, 74-1202, 74-1205, 74-1330,
74-1369, 74-1406, 74-1642 and
74-8102.

United States Court of Appeals,
Eighth Circuit.

Submitted June 10, 1974.

Decided Oct. 10, 1974.

Rehearing and Rehearing En Banc
Denied Nov. 4, 1974.

Philip E. Kaplan, Little Rock, Ark., for appellants in No. 73–1745.

O. H. Hargraves, Asst. Atty. Gen., Little Rock, Ark., for appellee in No. 73–1745.

Before LAY and HEANEY, Circuit Judges, and DEVITT, District Judge.*

LAY, Circuit Judge.

In August 1973, the United States District Court for the Eastern District of Arkansas rendered its decision in this class action brought by Arkansas prisoners against the members of the Arkansas State Board of Correction, Terrell Don. Hutto, the Arkansas Commissioner of Correction, and other prison officials. The petitioners are inmates at the Cummins Prison Farm and the Tucker Intermediate Reformatory. The petitions challenge the Arkansas prison system as a constitutional system of correction. Seven of the petitioners have appealed.** They assert error in the district court's findings. We reverse in part and remand the case to the district court for further proceedings consistent with this opinion.

This case had its origin in prior litigation. In 1969 the district court generally reviewed prison conditions in Arkansas and requested prison officials to suggest possible remedial measures. Holt v. Sarver, 300 F.Supp. 825 (E.D. Ark.1969) (*Holt I*). In 1970, after extensive hearings concerning Cummins and Tucker, the district court found that conditions and practices at both institutions were such that confinement in either constituted cruel and unusual pun-

---

* The Honorable EDWARD J. DEVITT, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

** This court on its own motion has consolidated seven other appeals of an Arkansas inmate, James C. Ellingburg, to be considered with the *Finney* case.

ishment, prohibited by the Eighth and Fourteenth Amendments to the United States Constitution. Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970) (*Holt II*).

In *Holt II*, the district court recognized that not all of the reforms directed could be accomplished overnight. It emphasized that removal of the unconstitutional conditions and practices would be required in a matter of months, not years. It stated:

> [T]he obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.

309 F.Supp. at 385.

This court affirmed *Holt II*. We directed the district court to retain jurisdiction for a period no longer "than necessary to provide reasonable assurance that incarceration therein will not constitute cruel and inhuman punishment. . . ." and to require an up-to-date report on the progress made in eliminating the constitutional violations. Holt v. Sarver, 442 F.2d 304, 309 (8th Cir. 1971).

The district court received a progress report on July 19, 1971. It held additional hearings in November and December of that year. On December 30, 1971, it ruled that "great progress" had

been made but that many problem areas remained, so it retained jurisdiction. In September of 1972 the district court observed that it was continuing to receive "a constant stream of complaints" from the inmates at Cummins indicating that the defendants were still violating the court's initial and supplemental decrees.[1] The court ordered a further evidentiary hearing. Lengthy hearings were conducted in December, 1972, and January, 1973. More than 30 inmates testified. Numerous defense witnesses also testified. The court denied individual relief, but granted petitioners a second supplemental decree enjoining certain practices of the Department of Correction. The district court also determined that it was no longer necessary to retain jurisdiction of the case. It is from this decree that the petitioners have appealed.

### Practice and Procedure Under § 1983

■ We recognize that the district court has received literally hundreds of complaints from Cummins prisoners and that until prison conditions change, the steady stream of prisoner complaints will continue. We are mindful as well of the administrative burden placed upon the Arkansas prison officials who must respond to individual grievances. We further realize that the judicial process often fails to provide needed relief promptly. Surely prisoners are also aware of the slowness of the judicial process, but until conditions change, prisoners have no recourse but to take their constitutional complaints to the courts.[2] By now state correctional au-

---

1. The court noted at that time that the following charges were being made:

 [T]hat inmates are being beaten, cursed, and abused by employees having them in charge; that inmates assigned to field work are being forced to trot or run to and from work and to run up and down the rows while working; that inmates accused of rule violations are sentenced to confinement in isolation in an arbitrary manner; that homosexual assaults are taking place; that inmates have been assigned to tasks beyond their physical strength; that inmates are not provided with proper medical attention; and that

 they are being retaliated against or threatened with retaliation for airing their grievances to the Court.
 Record at 435.

2. In Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), the Supreme Court faced a case in which a prisoner's complaint had been dismissed without a hearing or findings. The Court said:

 Federal courts sit not to supervise prisons but to enforce the constitutional rights of all "persons," including prisoners. We are not unmindful that prison officials must be accorded latitude in the adminis-

thorities should have provided facilities and programs consistent with constitutional standards. As the respondents urge, there is no such thing as a "perfect" prison system, but this does not relieve respondents of their duty to make their system a constitutional one in which the human dignity of each individual inmate is respected.[3]

## Substantive Review

We turn now to a consideration of the district court's decree and its supporting memorandum opinion. It has been said many times that the courts possess no expertise in the conduct and management of correctional institutions. This court has long recognized that it is only in the exceptional case where the internal administration of prisons justifies judicial supervision. On the other hand, courts need not be apologetic in requiring state officials to meet constitutional standards in the operation of prisons.

The district court found that significant progress and improvements had been made at both the Cummins and Tucker institutions since *Holt II*. It noted a "changing attitude and effort" on the part of the Arkansas Legislature, the present governor of Arkansas, his predecessor, the Board of Correction, the Commissioner and many employees of the institutions. The court found that those practices complained of in *Holt II* were now not officially approved or sanctioned. The district court did acknowledge that some constitutional deficiencies still existed and on that basis granted the class certain additional injunctive relief. However, the court

found no need to retain jurisdiction of the case.

■ This court recognizes the difficult issues the district court has passed upon since the commencement of this litigation in 1969. We are nevertheless compelled to find on the basis of the overall record that there exists a continuing failure by the correctional authorities to provide a constitutional and, in some respects, even a humane environment within their institutions. As will be discussed, we find major constitutional deficiencies particularly at Cummins in housing, lack of medical care, infliction of physical and mental brutality and torture upon individual prisoners, racial discrimination, abuses of solitary confinement, continuing use of trusty guards, abuse of mail regulations, arbitrary work classifications, arbitrary disciplinary procedures, inadequate distribution of food and clothing, and total lack of rehabilitative programs. We are therefore convinced that present prison conditions, now almost five years after *Holt I*, require the retention of federal jurisdiction and the granting of further relief.

## Physical Facilities

■ In *Holt II*, the district court set forth a detailed description of "life in the barracks" at the Cummins and Tucker Farms:

A barracks is nothing more than a large dormitory surrounded by bars; the barracks are separated from each other by wide hallways, and the complex of hallways is referred to as the "yard." At the present time the bar-

tration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations. But persons in prison, like other individuals, have the right to petition the Government for redress of grievances which, of course, includes "access of prisoners to the courts for the purpose of presenting their complaints." Johnson v. Avery, 393 U.S. 483, 485 [89 S.Ct. 747, 749, 21 L.Ed.2d 718]; Ex parte Hull, 312 U.S. 546, 549 [61 S.Ct. 640, 641, 85 L.Ed. 1034]. See also Younger v. Gilmore, 404 U.S. 15 [92 S.Ct.

250, 30 L.Ed.2d 142], aff'g Gilmore v. Lynch, 319 F.Supp. 105 (ND Cal.).
*Id.* 405 U.S. at 321, 92 S.Ct. at 1081; *see also* Haines v. Kerner, 404 U.S. 519, 92 S. Ct. 594, 30 L.Ed.2d 652 (1972).

3. The administrative burden placed upon the state by this never-ending stream of § 1983 inmate complaints should encourage it to adopt more effective prisoner grievance procedures. *Cf.* Inmate Grievance Procedures, South Carolina Department of Corrections (1973).

racks house more than 100 men each assigned without regard to anything but rank and race.

309 F.Supp. at 376.

The court also described the total absence of personal safety and security. It observed that if the State of Arkansas chose to confine penitentiary inmates in barracks, some means had to be provided to protect those inmates from assault and physical harm by other inmates. At the trial of that case, then-Commissioner Sarver "frankly admitted that the physical facilities at both units were inadequate and in a total state of disrepair that could only be described as deplorable." 442 F.2d at 308.

In the report submitted to the court in 1971, Commissioner Hutto expressed a realization of the problem he had inherited when he said: "The Board of Correction and this Administration feel strongly that the greatest problem in the so-called barracks is the problem of overcrowding." Despite this realization, however, and the passage of more than 1½ years, there is continued use of the barracks and continued overcrowding without adequate supervision. Approximately 125 to 135 men are still confined in each of the various barracks despite Mr. Hutto's concession that the barracks cannot be successfully operated with more than 60 to 80 inmates.

Some major improvements have been undertaken. A minimum security unit is under construction at the Cummins facility. It will provide individual rooms for each of 248 inmates. Many of the trusties will be housed there. The new unit will reduce overcrowding in the barracks. In addition a new maximum security unit has been built to house 80 to 90 inmates.

While these improvements were necessary to comply with the decree in *Holt II*, the record indicates that serious overcrowding has not been eliminated and that inmate assaults on other inmates still occur.[4] Moreover, relief will apparently be short-lived, for the testimony reveals that inmate population increases each year.

When a state confines a person by reason of a conviction of a crime, the state must assume an obligation for the safekeeping of that prisoner. One means of protecting inmates from each other is provision of adequate physical facilities. Long-range plans provide no satisfactory solution to those who are assaulted and physically harmed today. The fact that assaults and physical injuries have diminished does not demonstrate compliance with the court's decree of four years ago. The fact that there is *some* compliance is not good enough. As long as barracks are used respondents *must* assure that they are not overcrowded and are safe and sanitary for every inmate. There can be no exceptions. Upon remand, the district court shall meet with counsel and the respondents to devise a program to eliminate immediately the overcrowding of the barracks and to ensure the safety of each inmate. Lack of funds is not an acceptable excuse for unconstitutional conditions of incarceration. An immediate answer, if the state cannot otherwise resolve the problem of overcrowding, will be to transfer or release some inmates. The district court shall also satisfy itself that no additional prisoners will be confined at the Cummins Prison Farm if their confinement will result in continued overcrowding and perpetuation of conditions which fail to provide optimum safety and sanitation for every inmate.

One further problem arises from the overcrowding and inhumane conditions at Cummins. Youthful offenders confined at Tucker, the reformatory, have been transferred to Cummins, the adult facility, because they posed

---

4. In this regard Commissioner Hutto stated: It is the experience of this Administration that *only* adequate supervision by free-world personnel can and will assure inmates personal security and safety whether working in the fields or elsewhere.
Record at 391.

disciplinary problems for Tucker personnel. At Cummins the youths are housed either in solitary confinement for their own protection or placed in the general prison population. As Judge Henley observes, one could seriously question which is worse. Apparently, some such transfers have been completed quite summarily. The petitioners state that Tucker offers better conditions of confinement with greater possibilities for rehabilitation. They contend that any transfer to Cummins, since it amounts to a material change in their conditions of confinement, must be accompanied by procedures consistent with due process. The trial court agreed and granted some relief by requiring hearings on retransfer within a shorter period of time and at more frequent intervals. We need not pass on the due process issue for we feel that the transfer of juvenile offenders to Cummins is cruel and unusual punishment while unconstitutional conditions continue to exist there. We therefore direct the district court to enjoin any transfers from Tucker to Cummins until the constitutional infirmities within the latter institution are removed.

### Medical and Dental Facilities and Care

The respondents, through the testimony of Mr. Lockhart and Commissioner Hutto, agree that the medical facilities within the Arkansas correctional system are totally inadequate.

▆ At the time of the hearings, no physician, dentist or psychiatrist was employed by Cummins, although Mr. Hutto testified that a full-time doctor was being hired. A number of Cummins inmates are either mentally or emotionally disturbed. These people are, as the district court found, "dangerous to themselves and to their keepers and other inmates and tend to keep other inmates in states of unrest and excite-

ment." Holt v. Hutto, 363 F.Supp. 194, 200 (E.D.Ark.1973). In addition the district court found that many inmates have serious physical ailments which render confinement in the ordinary penal institution unbearable for them and, in the case of contagious diseases, dangerous for others. The district court found that deficiencies have existed and continue to exist but that "the Department has done the best that it could in the area of medical services with the resources at its command." 363 F.Supp. at 200. We find the problem to be much more complex and serious than this, and assuming the deficiencies are of a constitutional nature, we again cannot agree that lack of funds or facilities justify lack of competent medical care.

Subsequent to the decision in *Holt II,* Dr. T. H. Wortham, a member of the Board of Correction, requested the Arkansas Department of Health to evaluate the medical facilities of the Department of Correction. Its report, which was offered in evidence, is a comprehensive and detailed study encompassing the whole health delivery system, including the future workload, the facility needs and recommended action. The report states:

> One basic assumption is made upon which this study is built. It is this: the primary purpose of the correction system is to rehabilitate inmates so that they become productive citizens and a basic level of medical care is a necessary part of the rehabilitation process. This assumption includes the notion that a poor state of physical or psychological health will detract from rehabilitation efforts. Also included in this assumption is the concept that medical facilities, acceptable in quality and quantity, are a necessary part or [sic] providing this level of medical care.[5]

---

5. The Arkansas Board of Correction sought out a committee composed of seven physicians, four pharmacologists, one hospital administrator and one psychologist to visit the medical facilities of the Arkansas prison system and make recommendations. Their re-

port parallels that of the Department of Health. They stated:

> All members of the visiting team consider that all inmates have a basic right to medical, dental and psychological diagnosis, study and treatment. We also feel that it is basic that rehabilitation is the goal of

The report itself illuminates a total deficiency in both manpower and equipment resources. We highlight only some of those deficiencies found to exist at Cummins:

1. Lack of sufficient personnel to staff the facility on a 24-hour basis with free world help. Along with the added staffing, salary increases are necessary to retain those now employed.

2. The equipment is completely inadequate to continue present operations at an acceptable level. . . .

3. There is a tremendous need for more professional assistance. The lack of a physician at more frequent intervals places an unreasonable burden upon the present employees since they are called upon to do work which they are not qualified to perform.

4. Better transportation is needed if the present operation is maintained. There is an immediate need for an ambulance. The time and effort involved in transfers to Little Rock is very time consuming for the already overworked staff. In addition, it has resulted in 4 escapes during the period studied. . . .

\* \* \* \* \* \*

There is no registered professional nursing supervision at either of these medical facilities. Also, data gathered strongly suggests that in some cases a physician is not responsible for some of the medical care which is rendered. Therefore, even if only temporary medical care was offered at these facilities, the standards for licensure as an infirmary would not be met.

Some definitive, non-temporary, medical care is provided at Cummins. The length of stay of admitted patients indicates that the medical unit could be better defined as a hospital. If the Cummins unit is, in fact, a hospital and not an infirmary, deficiencies exist in all major areas of the licensure regulations.

Hospital requirements for physicians' care, nursing, medical records, patient accommodations, diagnostic and treatment service, dietary services, and physical facility are all significantly lacking.

\* \* \* \* \* \*

In fact, some patients appear to not be under the care of a physician, there is no professional nursing, required medical records are only partially maintained, basic laboratory and x-ray services are only partially available, no professional dietary service is provided, and a great many facility and environmental standards are not currently being met.

The Committee summarized:

Current facilities do not meet state licensure standards.

Diagnosis and treatment of emergency and acute illness is not adequately provided for due to a lack of facilities, equipment, and only part-time availability of professional medical staff.

Efforts of the Rehabilitative Services unit are not fully coordinated with efforts of the other medical disciplines.

Convalescent care and chronic illness treatment is provided in State Health facilities located in Little Rock and Booneville. A security problem is related.

Construction of adequate medical care facilities is justified on the basis of workload. [6]

---

prisons rather than punishment. We believe that a fact of basic wholeness of the person is an interest in his physical self and this interest should be stimulated.

6. At the Tucker Intermediate Reformatory the report relates in part as follows:

Medications are obtained from the Cummins unit as needed. There is apparently no resource available for sterile supplies for treatment of injuries.

An interview with the Tucker medic disclosed the following serious problems:

1. Lack of personnel at the infirmary: there presently is no other position authorized and the salary level is totally inadequate to attract qualified personnel.

2. X-ray facilities are needed.

The record additionally shows that there are no dentists at Cummins or Tucker. When a dentist does visit, no restorative work is done. Although the evidence indicates that prisoners who need major dental work, such as extractions, are taken into the dentist at Pine Bluff, the record likewise shows that none of the 1200 inmates at Cummins had made such a visit for a period of at least eight months prior to the district court hearing.

 The long-range studies conducted by the Board of Correction were made over two years ago. Mr. Hutto testified that a complete medical facility was to be built in the future. There is no question that Commissioner Hutto and the Board of Correction feel that they "*must* have a full service medical and dental program, even to the point of restorative medical and dental problems." Nevertheless, on the present record, we are convinced that they have achieved little more than a study and a *hope* to improve the present inadequate care. This court fully realizes, as did the district court, that this is a difficult problem for the Board of Correction and prison officials. In the meantime, however, 1200 inmates are continuously denied proper medical and dental care, and individuals with contagious diseases, as well as some who are mentally and emotionally ill, are at large in the general prison population. There is not even basic emergency service, much less any assurance of more complete medical treatment when necessary. We think it incumbent upon the court to hold additional hearings and to delineate within specific terms and time limitations not only an overall long-range plan but an immediate plan to update all medical equipment at all facilities, ensuring that every inmate in need of medical attention will be seen by a qualified physician when necessary. We refer the court to the comprehensive decree of Chief Judge

Johnson, in Newman v. Alabama, 349 F. Supp. 278, 286–288 (M.D.Ala.1972), as a guide.

*Inmate Guards*

 Perhaps the most offensive practice in the Arkansas correctional system at the time of *Holt II* was the use of armed trusties as prison guards. As recently as 1969, fully 90 percent of the security force of the Arkansas prison system consisted of such inmate guards. They virtually ran the prison. They sold desirable jobs to other prisoners and trafficked in food, liquor and drugs. There was no way to protect prisoners from assaults if the trusty guards permitted them. Several months after the district court ordered abolition of the trusty system in *Holt II*, Commissioner Hutto reported:

> *The Trusty System of armed guards has not in fact been dismantled at either Cummins or Tucker.* The efforts which have been made have succeeded reasonably well in removing much of the power formerly held by the trusties and placing this power into the hands of civilian personnel. Armed Trusties are being used on the towers at both Tucker and Cummins *and are used to guard outside work forces.* This is done, however, under the direct supervision of a civilian supervisor, who is present at all times with the work forces. Trusties have been removed completely from any responsibility or authority regarding inmate job assignments, promotions and demotions, and all disciplinary matters are handled by free world personnel. Even in institutions where there is a large number of experienced employees there is the constant danger that "trusted" inmates exercise subtle influences on staff in the area of job assignments and discipline. In a system such as this where there is still some shortage of employed personnel

---

3. The dental equipment is antiquated and in need of replacement.
4. Equipment for treating lacerations is entirely inadequate.

5. Laboratory equipment is inadequate to perform routine tests.

and many of these have little or no experience, this problem is more acute and, realistically, one must admit that this is a daily problem with which we have to deal. (Emphasis added).

The record is deficient in updating this report. However, the inmate complaints make it appear that the Commissioner's 1971 report represents the situation as of January 1973. Apparently some use of trusty guards continues at this time. This court affirmed the district court's opinion in *Holt II*, with emphasis on the admonition that trusty guards were not to perform prison jobs which ordinarily would be performed by free world personnel.

In *Holt II* the district court found the use of field guards objectionable. It observed:

> The system of field guards and the system of using trusty long line riders and inmate pushers go hand in hand, and the combination of the two is one of the things that makes the field guard system so dangerous to rankers. Field guards are much less likely to fire on a ranker or on a group of rankers in the immediate presence of a civilian long line supervisor than they are in a situation where the rankers are actually being worked by other inmates. It appears to the Court that the answer, however unpalatable it may be, is to eliminate the positions of long line rider and inmate pusher and to put each long line under the immediate charge of one or more free world people.

309 F.Supp. at 384.

Although the district court in *Holt II* found the use of trusty guards in the towers less objectionable, that did not mean that it was to be continued.

We feel the time for dismantling the entire system has long passed. The district court shall order that it be completely phased out within a few months.

*Physical and Mental Brutality*

The district court supplemented its decree of December 30, 1971, by stating:

> (g) Without limiting the generality of the term "cruel and unusual punishment" appearing in Paragraph 4 of the Court's Supplemental Decree of December 30, 1971, that term is now defined as including the infliction upon any inmate of the Department of Correction of any unreasonable or unnecessary force in any form, the assigning of any inmate to tasks inconsistent with his medical classification, the use of any punishment which amounts to torture, the forcing of any inmate to run to or from work, or while at work, or in front of any moving vehicle or animal, and the infliction of any punishment not authorized by the Department's rules and regulations.

In its memorandum order the district court pointed out that Commissioner Hutto, Superintendent Lockhart and the other high-level officers were qualified for their jobs and were attempting to perform well. However, the court expressed concern over the lower echelon of prison personnel.[7] The court's findings and discussion concerning habitual harassment of inmates by prison personnel, through physical and mental abuse, covers several pages of its opinion. As the court indicates, the continuing presence of instances of brutality is

> . . . particularly significant here in view of the long history of brutality to inmates of both Cummins and Tucker that was practiced for so many years and that has been described in detail in earlier opinions

---

7. The court stated:
 Those employees have in general been recruited locally; they are poorly paid by modern standards; they have had little training or experience; many of them are uncultured and poorly educated; some of them are quite young, perhaps too young to be in position of authority over convicts; some of them are quick tempered. If one adjective is to be used to describe them, it would be "unprofessional."
 363 F.Supp. at 201.

of this Court and the Court of Appeals.

363 F.Supp. at 212.

Unquestionably the Department of Correction has adopted a policy condemning all forms of abuse of inmates. Commissioner Hutto issued his policy memoranda prohibiting "physical abuse of inmates" in December of 1971. Nevertheless, there is evidence as of January 1973 that excessive force, verbal abuse and various forms of torture and inhumane punishment continue.

The district court demonstrated a keen perception and understanding of how conflicts arise between prison personnel and inmates. The court points out that the overall working conditions and prison environment provide a fertile ground for continued abuses and violations of earlier decrees. Although the district court did not find the prison working conditions so harsh as to constitute cruel and unusual punishment in themselves, it observed that the inmates on the "hoe squads" are required to work long hours under constant prodding; that at times inmates are assigned to work at tasks beyond their strength or medical ability; and that older or weaker inmates are required to keep up with the younger inmates at arduous tasks under threat of disciplinary proceedings. The court found evidence that the inmates are at times still forced to run to and from work or while at work, and that some crews are required to race with another crew in the performance of the same type of work. The record indicates that the inmates have been required to run in front of moving vehicles or ridden horses. Finally, even after *Holt II*, a young boy named Willie Stewart was given a *one-day* sentence. On that day he was put through all forms of mental and physical torture, ending when the guards shot at his feet and inadvertently killed him. This "treatment," according to Mr. Hutto, has stopped. Unfortunately, it took the life of a young prisoner, rather than the court's prior decree, to accomplish it.

In addition to physical abuse the record reveals that the prison personnel at all levels employ profane, threatening, abusive and vulgar language, together with racial slurs, epithets, and sexual and scatalogical terms when addressing inmates. Conduct prohibited by official prison rules is freely engaged in.

We have discussed previously the departmental obligation to protect inmates against both physical and mental abuse by the correctional staff and other inmates. The continued infliction of physical abuse, as well as mental distress, degradation, and humiliation by correctional authorities demonstrates that mere words are no solution. Such unlawful conduct by correctional personnel is of major significance leading to this court's finding that the present correctional system in Arkansas is still unconstitutional. For this reason, as well as those stated elsewhere, the district court shall retain jurisdiction and take, if it deems advisable, additional evidence on those conditions of confinement, hiring policies, working conditions and disciplinary measures which must be changed in order to provide a continuing prophylaxsis against such cruel and inhumane treatment.

This court finds that the present working conditions are unconstitutional and must be radically changed. If a man works too slowly or refuses to work he not only loses his entitlement to statutory good time (Ark.Stat.Ann. § 46–120 et seq. (1973)), but faces solitary confinement as well. In effect, lower echelon personnel are given the power to impose additional mental punishment by threatening solitary confinement to those who do not work to their satisfaction. Arbitrary power is thus placed in the hands of persons obviously lacking the discretion to exercise it wisely. Absent evidence of qualified supervisors for the work crews, a possible solution is to deprive the line guards of this power. The district court should review these conditions bearing in mind this court's concern for the lack of rehabilitation

and treatment for the prison population and the resultant physical and mental abuse.

## Maximum Security

One of the principal grievances in both *Holt I* and *Holt II* concerned the intolerable conditions in the old maximum security units at Cummins. Since *Holt II*, a new facility has been constructed alleviating to a great extent problems of sanitation and overcrowding. Some problems remain, however. One such problem is the practice of placing inmates awaiting disciplinary hearings in *punitive* solitary confinement. This court has previously held that solitary confinement is not, per se, cruel and unusual punishment.[8] Burns v. Swenson, 430 F.2d 771, 777–778 (8th Cir. 1970) cert. denied, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972). Under certain circumstances, such confinement can violate the Eighth Amendment. This fact was demonstrated in the original *Holt* decisions.

■■ Complaint is made by prisoners who are placed in isolation for "administrative segregation," pending disciplinary action for rule infraction. Judge Henley limited this segregation to three days' duration. 363 F.Supp. at 207. We find such administrative segregation as limited by the trial court to fall within correctional discretion and not to violate due process. We assume, of course, that if disciplinary action is not taken against the inmate for lack of evidence, full privileges will be restored and any good time he would have earned if the opportunity had been available will be credited to him.

■■ ■■ In the punitive wing, we note the prisoners are denied the regular prison diet. "Grue" is the term applied to the tasteless, unappetizing paste-like food which is served to prisoners in solitary confinement as a form of further punishment. In *Holt I*, the district court found that grue constituted a nutritionally sufficient diet. 300 F.Supp. at 832. The procedure followed by prison authorities when an inmate is placed on grue, however, makes that conclusion dubious. The prisoner receives one full meal at least every three days and six consecutive full meals every 14 days. At the end of that period, he is given a thorough physical examination. If medical reasons dictate a regular diet then it is ordered. Otherwise the prisoner is continued on this punitive treatment. This, in itself, indicates an awareness of possible dietary insufficiencies. There exists a fundamental difference between depriving a prisoner of privileges he may enjoy and depriving him of the basic necessities of human existence.[9] We think this is the minimal line separating cruel and unusual punishment from conduct that is not. On remand, the district court's decree should be amended to

8. At the same time we cannot help but observe that a recent study conducted by the National Advisory Commission on Criminal Justice led to the following observation by that group:

The Commission recognizes that the field of corrections cannot yet be persuaded to give up the practice of solitary confinement as a disciplinary measure. But the Commission wishes to record its view that the practice is inhumane and in the long run brutalizes those who impose it as it brutalizes those upon whom it is imposed. Report on Corrections, The National Advisory Committee on Criminal Justice Standards and Goals, p. 32.

9. *See, e.g.*, Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971), where the court considered a bread and water diet:

The practice is therefore both generally disapproved and obsolescent even within this penal system. It is not seriously defended as essential to security. It amounts therefore to an unnecessary infliction of pain. Furthermore, as a technique designed to break a man's spirit not just by denial of physical comforts but of necessities, to the end that his powers of resistance diminish, the bread and water diet is inconsistent with current minimum standards of respect for human dignity. The Court has no difficulty in determining that it is a violation of the eighth amendment. Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968) ; Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y.1970). *Id.* at 647.

ensure that prisoners placed in punitive solitary confinement are not deprived of basic necessities including light, heat, ventilation, sanitation, clothing and a proper diet.

### Disciplinary Process

The district court reviewed the disciplinary procedures employed in the Arkansas prison system and found them lacking in several particulars of due process. It granted a measure of injunctive relief. We agree with the relief granted, but in view of the Supreme Court's subsequent decision in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), we feel more is required.

The district court found that the disciplinary committee often acted in a summary manner displaying a decided air of hostility toward the inmates before it. Accordingly, the court ordered that future disciplinary proceedings must be begun within three days of the occurrence of the alleged offense. It also ordered that all hearings, to the extent possible, be held between the hours of 6:00 a. m. and 6:00 p. m., and that they be reported in such a manner that a reviewing authority could determine what had transpired. 363 F.Supp. at 207–208.

The petitioners on appeal object to the following aspects of the disciplinary procedure now in force: (1) the possibility that the same person who wrote the disciplinary may sit in judgment, (2) the absence of a right of confrontation, (3) lack of sufficient prior notice of charges, and (4) the lack of any duty upon the "court" to explain the basis for the result reached. In McDonnell, the Court held that prison disciplinary proceedings must contain the following safeguards: (A) written notice of charges at least 24 hours prior to the hearing; (B) a qualified right to call witnesses,[10] and (C) a written statement by the committee of the factual basis for its decision. These procedures constitute the minimum assurance of due process.

There is evidence that on occasion the same officer who invokes disciplinary measures sits on the committee to review the matter. This practice has been unanimously condemned by those courts which have considered it. United States ex rel. Miller v. Twomey, 479 F. 2d 701, 715–716 (7th Cir. 1973); Sands v. Wainwright, 357 F.Supp. 1062, 1084–1085 (M.D.Fla.), vacated, 491 F.2d 417 (5th Cir. 1973); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574–575 (E.D.Pa.1972); Landman v. Royster, 333 F.Supp. 621, 653 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767, 784 (N.D.Cal.1971). As stated in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), with reference to parole revocations: "The officer directly involved in making recommendations cannot always have complete objectivity in evaluating them." Id. at 486, 92 S.Ct. at 2602. The district court should bar the charging officer from sitting in judgment on his own complaint in disciplinary proceedings.

### Rehabilitation

In Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), Mr. Justice Blackmun stated: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Id. at 738, 92 S.Ct. at 1858. The Supreme Court has recognized rehabilitation as one of the ends of correctional confinement. See, e. g., Procunier v. Martinez, 416 U.S. 396, 412–413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). Arkansas statutes as well stipulate that efforts should be directed toward the rehabilitation of persons committed to the

---

10. McDonnell makes clear that prison authorities may reject the prisoner's request to call witnesses where security problems might arise. It is suggested when this occurs that officials make clear the reason for denying the request. 94 S.Ct. at 2980.

stitutional care of the Department of Correction.[11]

In *Holt II*, the district court said that the lack of rehabilitative programs could, in the face of "other conditions," be violative of the Eighth Amendment. With this we agree. Furthermore, we find that those other conditions persist. Convicts in the Arkansas system are forced to labor long hours under arduous conditions. They are faced with constant threats of physical and mental abuse if their work or conduct falls below often arbitrary standards. They are left almost no time for self-advancing activities or recreation, and the testimony of prison officials indicates that even if time were available, rehabilitative programs are generally not available. The Commissioner has testified concerning the building trades apprenticeship program and the increasing opportunity for basic schooling. However, these programs at Cummins are still very limited, accommodating a relatively small number of inmates. We thus deem it necessary that the respondents be required to submit to the court an overall program for treatment and rehabilitation of the inmates at both Cummins and Tucker.

*Racial Discrimination*

When *Holt II* was before the district court in 1970, racial discrimination was a serious problem within all the institutions operated by the Arkansas Board of Correction. Living facilities were segregated at that time and there was convincing evidence of racial discrimination in other areas of prison life from job assignments to class status. The court ordered immediate elimination of all racial discrimination. By the time the district court heard this case, there had been a marked improvement in this regard. Living facilities, with the exception of the punitive segregation wing at Cummins, were integrated. Nonetheless, the court found that discrimination still pervaded other facets of prison life. Accordingly, the district court again enjoined racial discrimination in several particulars, including: (1) interference with Black Muslim religious practices; (2) segregation of prisoners in maximum security, and (3) discrimination in such areas as inmate classification, job assignments, privileges, personal appearance, disciplinary proceedings and punishments. With this we agree, but once again we find that the court's decree stops short of its intended goal.

The court specifically found that the more intangible forms of racial discrimination could not be eliminated until the Arkansas Department of Correction was integrated. This is especially true in the areas of job classification and disciplinary proceedings, where preconceived ideas and often unconscious prejudices may seriously affect an inmate's life.

---

11. Ark.Stat.Ann. § 46–116 (1973):

Classification and treatment programs.— Persons committed to the institutional care of the Department shall be dealt with humanely with efforts directed to their rehabilitation. For these purposes, the Department may establish programs of classification and diagnosis, education, case work, counselling and psychiatric therapy, vocational training and guidance work, and library and religious services; other rehabilitation programs or services as may be indicated; and shall institute procedures for the study and classification of inmates; provided, however, that the Commissioner shall, with the approval of the Board, establish rules and regulations for the assignment of inmates to the various programs, services and work activities of the Department, and inmates in the institutions of the Department may participate in and benefit from the vocational, educational and rehabilitation services of the respective institutions solely within the rules and regulations of the Department as determined by the Commissioner, subject to appeal and review by the Board or a designated review board in accordance with procedures that shall be established therefor by the Board. Women inmates committed to the Department shall be housed separately from men. Work assignments by women inmates shall be made by the Commissioner under rules and regulations promulgated by the Board, and any contact of women prisoners with male inmates shall be under direct supervision of the Board.

The assistant superintendent in charge of the disciplinary court testified that, with the exception of a non-voting black minister, no blacks had ever sat in judgment on the disciplinary court, although at the time of trial fully 48% of the inmate population was black. A compilation of disciplinary proceedings leads to an unmistakable inference of racial discrimination, be it intentional or not. In the area of job classification and admission to the few available rehabilitative programs, the same inference arises, for blacks occupy the menial positions while the more desirable programs are dominated by white inmates. *Cf.* Smith v. Board of Education of Morrilton, 365 F.2d 770 (8th Cir. 1966).

■ Very little has been accomplished in the recruitment of black employees. Those who have been hired assume, with slight exception, no position of control, influence or even persuasion. Resources, according to Commissioner Hutto, will not permit offering salaries sufficient to attract the qualified individuals he seeks. We need only repeat that inadequate resources cannot justify the imposition of constitutionally prohibited treatment. Even assuming qualified blacks cannot be found, we are not persuaded that an alternative such as establishing a program in which blacks could be trained until qualified is not viable.

■ On remand the district court should amend its decree to include an affirmative program directed toward the elimination of all forms of racial discrimination. In doing so it should consider the standards now employed in the hiring and promotion of prison personnel. The court must assure itself that those standards are reasonably related to proper correctional goals and not designed to preserve institutional racial discrimination.

*Mail Regulations*

The petitioners in the trial court also contested restrictions placed upon the use of the mails.[12] Inmate correspondence is divided by Arkansas prison officials into three classes: privileged, general and special purpose. Privileged correspondence involves mail to or from courts, federal and state officials and inmates' attorneys. General correspondence includes mail between a prisoner and friends or business acquaintances. Special purpose correspondence is described only as mail to or from persons not qualifying under the general or privileged categories.

The petitioners challenge that provision which allows prison officials to open and search privileged mail and to open and read general and special purpose correspondence. They also challenge the "approved mailing list" procedure whereby a prisoner must submit the name of a potential correspondent for approval both by the intended correspondent and prison officials before he may send or receive mail from that person. The district court considered these issues at length but ordered only that privileged correspondence be examined in the presence of the inmate.

■ In Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the Supreme Court considered a challenge to the California prisons' mail censorship policies.[13] Basing its decision on the infringement of "liberties of free citizens . . . implicated in censorship of prisoner mail" rather than on the right of the prisoners themselves to be free from unnecessary interference with their communications, the Court held that censorship of prison mail is justified only if the particular regulations were necessary to further a substantial government interest unrelated

---

12. Petitioners do not seek further relief on prison mail regulations on appeal. However, in a consolidated appeal by James Ellingburg, No. 74–1330, the regulations are further challenged. *See infra.*

13. The district court's opinion was written at a time prior to the Supreme Court's decision in *Martinez* and *McDonnell.*

to the suppression of expression and the limitations imposed were no greater than necessary to accomplish that objective. If deemed necessary inspection of outgoing or incoming mail in the presence of an inmate is never objectionable. However, any kind of censorship regulations carry a heavy burden. The district court should review the mail regulations under the standards set out in *Martinez*. *See* 94 S.Ct. at 1811 et seq.

The petitioners' second complaint concerns the mailing list requirement, whereby a prisoner may not correspond with any person who has not previously consented. This procedure affects potential correspondents whenever prison officials refuse permission to include a name on the list. However, it more directly places prior restraint on a prisoner's freedom to correspond with whomever he chooses. It is now well settled that a prisoner does not shed his basic constitutional rights at the prison gate. Cruz v. Beto, 405 U.S. 319, 92 S. Ct. 1079, 31 L.Ed.2d 263 (1972); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 142 (1972); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L. Ed.2d 142 (1971); Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). While it has been recognized that these rights and immunities do not always assume the same form in prison that they do in free society, Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), they are, nonetheless, present. We need go no further to recognize that a prisoner's First Amendment right should not be restricted by governmental interference unrelated to any legitimate governmental objective.

At trial, prison officials offered three justifications for the approved mailing list procedure. First, they urge that those to whom a prisoner writes may wish to visit him and the mailing list procedure gives them an opportunity to investigate potential visitors beforehand to determine whether a visit should be permitted. Second, they contend that some people, because of their criminal background, have no right to correspond with prisoners. Finally, they state that some people do not wish to receive mail from prisoners. Applying the *Martinez* test, we find these justifications wanting.

If prison officials have a valid interest in investigating potential visitors, obviously that interest may be protected by less intrusive means, such as the submission of a visitors' list. We are not persuaded that all correspondents need to be investigated on the chance that some may visit. It is equally unavailing to argue that some persons, because of their criminal reputation, have no business communicating with prisoners. A person does not forfeit his First Amendment rights simply because he acquires a bad reputation. In like manner, a prisoner does not lose the protection of the First Amendment simply because those with whom he wishes to communicate are "disreputable" in the eyes of the prison administrators. This is not to say that when questions of institutional security are involved, officials may not be justified in limiting correspondence on a particular basis. We simply find this excuse too broad to justify application of the mailing list system to all inmates. In *Martinez*, the Supreme Court said that just as Post Office officials could not examine all mail for evidence of crime, prison officials could not censor all mail for that purpose. The analogy is apparent. Finally, the fact that some people may not wish to have a prisoner write to them or their children cannot justify this system. If a person does not wish to receive prisoner mail, he may so notify the prison, and then prison officials may be justified in refusing to send further mail. The present broad regula-

tion, however, is not justified by this eventuality.

We conclude that the test of *Martinez* has not been met by the mail list procedure employed in Arkansas and direct the district court to order its elimination.

## Failure to Make Specific Findings

■ The district court, while granting injunctive relief to the class, denied singular relief to the individual petitioners. The district judge stated that he would make specific findings as to an individual petitioner only upon individual request. No requests were made, but on appeal petitioners cite as one ground of error the district court's failure to make specific findings.[14]

■ We find that this was error. Rule 52(a) of the Federal Rules of Civil Procedure requires the district court to make findings of fact in each individual case. The burden should not be upon the petitioner to request specific findings when it is incumbent upon the court to make the findings in each individual case.[15] The district court's error does not deprive this court of jurisdiction to review the record.[16] However, the absence of specific findings does make appellate review more difficult.

■ We think that Willie Montgomery and Larry Gray stated claims upon which individual relief could possibly be proper. The testimony of Willie Montgomery indicates that he was wrongfully assaulted by prison guards and that, although the correctional employees were discharged, Montgomery was sentenced to the maximum security unit and suffered loss of good time. As for Larry Gray, he alleges that he is unable to work due to a foot ailment. He complains of receiving disciplinaries resulting in loss of good time and class status. In Wilwording v. Swenson, 502 F.2d 844 (8th Cir. 1974), we pointed out that an individual is not entitled to have his record expunged or corrected simply because the full panoply of due process procedures was not granted to him prior to the effective date of *McDonnell*. The Supreme Court made it clear in *McDonnell* that the procedural due process requirements set forth therein were not retroactive. However, where the challenge is made that good time was arbitrarily taken without any supporting evidence whatsoever, the prisoner states a valid claim for relief. *Wilwording, supra*. This we construe to be the primary thrust of the complaints of Montgomery and Gray and we feel that it

14. We were informed in oral argument that petitioners' counsel failed to comply with the court's request and failed to notify the inmates of the necessity of seeking individual specific findings. We hesitate to condemn counsel for this oversight because of the tremendous service which they have performed in processing these complex cases. We are told that this was an oversight and not intentional.

15. This requirement fulfills a threefold purpose: (1) to aid appellate review by affording a clear and concise statement of the basis for the court's decision, Cross v. Pasley, 267 F.2d 824 (8th Cir. 1959); (2) to make the decision of the court definite to aid in future application of the doctrine of *res judicata*; and (3) to cause the trial judge to fully and conscientiously consider the basis for his decision, United States v. Birnbach, 400 F.2d 378 (8th Cir. 1968). None of these purposes is fulfilled when a court dismisses a claim or claims for relief without specified findings.

16. Findings of fact by the district court, while required by Rule 52(a), are not jurisdictional in an appellate court. An appellate court may render a decision in their absence if it feels that it is in a position to do so. Westley v. Southern Ry. Co., 250 F.2d 188 (4th Cir. 1957); Morris v. Williams, 149 F.2d 703 (8th Cir. 1945). It is in a position to do so when either of two factors are present: (1) the record itself sufficiently informs the court of the basis for the trial court's decision on the material issue, or (2) the contentions raised on appeal do not turn on findings of fact. *See generally* 9 Wright & Miller, Federal Practice and Procedure § 2577 at 699–700 (1971).

While this court may review a decision in the absence of factual findings, it may not make its own findings of fact. *See* Lee v. Beto, 429 F.2d 524 (5th Cir. 1970); Davis v. United States, 422 F.2d 1139 (5th Cir. 1970); Irish v. United States, 225 F.2d 3 (9th Cir. 1955).

was prejudicial error to fail to make specific findings in their individual cases. Denial of individual findings to the other petitioners, however, was harmless error for, as we review their appeals, it appears they did not state a claim upon which relief could be granted.

*The Ellingburg Petitions*

We have consolidated with the *Finney* case the several pending appeals of James C. Ellingburg, a Cummins prisoner. Most of his petitions relate to conditions of confinement at Cummins and therefore present issues of common concern with our discussion in *Finney.* Some of the district court rulings in the Ellingburg cases adopt Judge Henley's decision in *Finney* as the basis for dismissal.

In 74–1369, petitioner Ellingburg asserts, *inter alia,* that Cummins inmates are prohibited from giving legal assistance to one another. It appears that there is one attorney available for inmate consultation at Cummins (the record is silent as to the situation at Tucker) but that he is not permitted to assist the prisoners in civil litigation. The Supreme Court in *McDonnell* said:

> The right of access to the courts, upon which *Avery* was premised, is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. It is futile to contend that the Civil Rights Act has less importance in our constitutional scheme than does the Great Writ. The recognition by this Court that prisoners have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often "totally or functionally illiterate," were unable to articulate their complaints to the courts. Although there may be additional burdens on the Complex, if inmates may seek help from other inmates, or from the inmate adviser if he proves adequate, in both habeas and civil rights actions, this should

not prove overwhelming. At present only one inmate serves as legal adviser and it may be expected that other qualified inmates could be found for assistance if the Complex insists on naming the inmates from whom help may be sought.

94 S.Ct. at 2986.

Upon remand the district court should re-examine procedures relating to inmate assistance to satisfy the alternative requirements of Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). *Cf.* McDonnell v. Wolff, 483 F.2d 1059, 1064–1066 (8th Cir. 1973).

In 74–1202, Ellingburg seeks to hold prison officials in contempt for failing to phase out the armed trusty guard system in the towers and for failing to completely segregate diseased prisoners from the general prison population. We have now issued specific directions concerning these conditions. The district court's earlier opinions strongly implied that these measures should be taken, but until today there has been no specific order to that effect. Before contempt may lie the parties must have actual knowledge of the order and the order must be sufficiently specific to be enforceable. United States v. Di Mauro, 441 F.2d 428, 439 (8th Cir. 1971). The appeal is dismissed.

In 74–1205, Ellingburg disputes the type of medical care received for his tuberculosis and other alleged ailments. The district court deferred to the judgment of prison medical personnel. This was the subject of an earlier petition dismissed as failing to state a claim for relief under § 1983. This court affirmed the dismissal. *See* Ellingburg v. Loyd, 491 F.2d 728 (8th Cir. 1974). This appeal is dismissed.

In 74–1330, Ellingburg attacks the prison mail regulations.[17] For the reasons discussed above we find the district court's dismissal of this claim erroneous. We reverse and remand this claim with directions that it be considered by the

17. On appeal he erroneously confuses this case with his appeal in 74–1205.

district court in accord with our opinion above.

In 74–1406, the petitioner complains about the safety of inmates; he sets forth specific facts on appeal. We dealt with this overall concern above, and since the general relief afforded there is applicable here, the judgment of dismissal should be affirmed as modified by our prior discussion.

In 74–8102, Ellingburg v. Sewell, petitioner seeks damages by reason of an alleged "conspiracy" to murder him. The district court, The Honorable Paul X Williams presiding, refused to file the petition since the complaint was deemed frivolous on its face. We disapprove this procedure of failing to file petitions in the court record. *See* Jones v. Lockhart, 484 F.2d 1192 (8th Cir. 1973). This was error and the complaint should be filed. If the district court is still satisfied that the complaint is frivolous or fails to state a claim for federal relief, an appropriate judgment should be rendered. The court's refusal to file the complaint is set aside.

In 74–1642, petitioner appeals from the denial of separate injunctive relief on his allegation that a correctional employee, A. A. Lucas, the Food Service Supervisor at Cummins, had an active tubercular condition. On August 14, 1974, the district court denied relief relying on a report from David Crittenden, M.D., Mr. Lucas' physician, which states that although Mr. Lucas has a tubercular condition he is no danger to others and recommends that he be allowed to continue as a prison employee. The district court's dismissal was proper. *See* Cates v. Ciccone, 422 F.2d 926 (8th Cir. 1970). Ellingburg's petition for a writ of mandamus to provide an immediate hearing in this case is dismissed as moot.

The appeals in 74–1330, 74–1369 and 74–8102 are reversed and remanded in accordance with the directions made. The appeals in 74–1202, 74–1205, 74–1642 and 74–1406 are ordered dismissed.

*Retention of Jurisdiction*

The two Ellingburg appeals that are remanded for reconsideration, 74–1330 and 74–1369, are hereby ordered consolidated with the *Finney* case so that the propriety of the mail regulations and the adequacy of legal assistance may be determined at the same time as the *Finney* challenges are heard on remand.

This case and the individual Ellingburg appeals remanded herein are to be retained by the district court for the holding of additional evidentiary hearings. The district court, if it deems it necessary, should call its own witnesses in order to fully explore the viable alternatives in meeting respondents' immediate responsibility to eliminate the unlawful conditions which now exist in the Arkansas prison system. The district court may consider appointing federal monitors or a committee of lawyers or other responsible citizens to assist in eliminating the present practices of physical abuse and torture. *Cf.* Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12 (2d Cir. 1971). We do not suggest that the district court must do this, we merely recommend it as worthy of consideration in light of the history of these cases. The district court must decide whether continued abuse of its process and of its decree require such measures.

We regret the continued court supervision required by our decision since we are aware of the tremendous docket load under which the district court labors. We realize that the district court's opinions in *Holt I* and *Holt II* viewed unconstitutional conditions in a state prison system in an unprecedented light. Our opinion here is in no sense intended to detract from our recognition of the conscientious and responsible manner in which the district court has undertaken its task. The problems it continues to encounter in these decisions are monumental. Our decision is intended to reinforce its view in a newly developed area of constitutional law. Our continuing confidence and respect for the dis-

trict court gives us assurance that a suitable end will be quickly attained.

█ Based on the overall record before us, it is our firm conviction that the Arkansas correctional system is still unconstitutional. We are fully cognizant of the considerable progress which has been made by the Board of Correction with the minimal resources at hand. However, we confront a record and factual history of a sub-human environment in which individuals have been confined under the color of state law. The effort to make *some* amelioration of those conditions will simply not suffice. The fact that an individual has violated the criminal law, is generally uneducated and in poor health is no justification for inhumane treatment and brutality. Segregation from society and loss of one's liberty are the only punishment the law allows.

Affirmed in part and reversed in part; the cause is remanded to the district court with directions contained herein.

On Petition for Rehearing

PER CURIAM.

Respondents have filed a petition for rehearing and alternatively for a rehearing en banc. They allege that this court's opinion is factually and legally erroneous in all respects. The basic thrust of their complaint is that the latest evidentiary hearing preceding this appeal occurred 21 months before this court's opinion was handed down and that the opinion fails to reflect the *facts* as they are now. The respondents list a long line of physical improvements and changes primarily directed toward up-

grading the glaring medical deficiencies set out in the prior record. The respondents' brief on rehearing states that since the district court's opinion they have as well invoked a grievance procedure, instituted rehabilitation programs, improved security measures, broadened inmate assistance programs and are in compliance with seven of the major concerns condemned in this court's opinion. At this stage of the proceeding we can only express our sincere hope that this is true.

█ This court is aware that major improvements have been taking place within the Arkansas Correction System since the evidentiary hearings. However, an appellate court is not a fact-finding court and must necessarily render its decisions on the evidence and record before it. It cannot receive new evidence. One of the fundamental reasons this court ordered a remand of this case to the district court was to allow the district court the opportunity to take additional evidence concerning interim improvements in the prior deficient procedures and practices. The trial court is the only court equipped to test evidentiary compliance and the only forum in which to raise any allegations of continuing deficiencies. Our remand was additionally based on the fact that two decisions of the Supreme Court of the United States, Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), shed new light on disciplinary procedures and mailing regulations.[1] Both of these decisions were handed down over a year and one-half after the district court's rulings on these areas.

1. Our condemnation of the mailing regulations, particularly as it related to the requirement of a mailing list, is hardly moot. The district court's earlier opinion discusses the regulations at length. Our remand for reconsideration of the regulations under *Procunier* allows the Department of Correction the same flexibility recognized in *Procunier*. A study of the Supreme Court opinion demonstrates that all mailing lists are not necessarily condemned. See *Procunier, supra* at 1811 et seq. However, we find a regulation which has no specificity as enforced by respondents, in violation of the constitutional principles laid down in *Procunier*.

It is for the district court to judge on the basis of these decisions whether the disciplinary procedures and mailing regulations are in compliance with the guidelines set forth in those decisions. As was our earlier observation the standards set forth in the district court's earlier decree did not fully contemplate the limits set out later in *Procunier* and *McDonnell.*

We do not consider it too great a burden on the Board of Correction and prison officials to require them to make an evidentiary showing in the district court. If, as urged, there is now constitutional compliance, it should be fairly simple for respondents to demonstrate it to the district court. Once the district court is convinced that constitutional standards, as we defined them, have been met, it may terminate its jurisdiction of the case. We recognize that the sooner the district court may discharge its jurisdiction of the case, the better it is for everyone.

Without minimizing the other areas discussed in this court's opinion, our major concern related to (1) the overcrowding in the barracks and the multifaceted problems this breeds, (2) the lack of medical supervision and equipment, including proper supervision and treatment of the emotionally ill, and (3) the continuing evidence of physical and mental brutality.

If overcrowding and its subhuman effects have been eliminated,[2] the respondents can easily demonstrate this by affidavit. If changes in the medical treatment and facilities have raised them to conformity with constitutional standards, this, too, can be demonstrated by documentary proof. Notwithstanding some diminution in the physical and mental brutality, revealed in the first *Hutto* cases, the district court concluded, based on the evidence of 21 months ago, that it was still necessary to further enjoin such abuse. Respondents now say that this has come to an end and that security is such that it is unfair to still appraise the prison system in this light. Yet prisoner complaints continue to be filed alleging verbal abuse, assaults and beatings on inmates by those in authority. Petitioner Ellingburg has filed a motion in response to this motion for rehearing. In his motion he alleges that on October 14, Superintendent Lockhart announced to some 500 or more inmates "that appeals court ruling is nothing but a bunch of shit and don't mean nothing." He alleges that on October 17 an incompetent inmate, one Herschel Spears, was physically assaulted and beaten by an inmate yard security man; that on the same date three inmate floor walkers assaulted another inmate. We do not assume the truth of these allegations; however, if any of the allegations are true it is continuing proof that glaring constitutional deficiencies still exist. The truth of these allegations is for the district court to determine. We found sufficient basis in the previous record to justify further federal jurisdiction to determine what steps must be taken to assure an end to physical and mental abuse.

The respondents' motion for rehearing is overruled.

2. However, based upon the showing made by the respondents in their petition for rehearing, this would seem not to be the case.